# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Sotolidis, Constantine
Sotolidis, Isaak
Sotolidis, Irene
157 Bala Avenue, Bala Cynwyd, PA

**DEFENDANTS**

BTC Holdings 432, LLC
c/o Bow Tie Cinemas, LLC, 641 Danbury Road, Ridgefield, CT 06877
BTC Venture 18, LLC
c/o Bow Tie Cinemas, LLC, 641 Danbury Road, Ridgefield, CT 06877

**(b)** County of Residence of First Listed Plaintiff   Montgomery, PA
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Fairfield, CT
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:     IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Kristy M. Castagna, Esquire
Kane, Pugh, Knoell, Troy and Kramer
510 Swede Street, Norristown, PA 19401
(610) 275-2000
ID# - 206740

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1   U.S. Government
Plaintiff

☐ 2   U.S. Government
Defendant

☐ 3   Federal Question
*(U.S. Government Not a Party)*

☒ 4   Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                              *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY**   **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane   ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product    Product Liability | | | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument |     Liability   ☐ 367 Health Care/ | | | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel &    Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 450 Commerce |
|   & Enforcement of Judgment |     Slander    Personal Injury | | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers'    Product Liability | | ☐ 830 Patent | ☐ 470 Racketeer Influenced and |
| ☐ 152 Recovery of Defaulted |     Liability   ☐ 368 Asbestos Personal | | ☐ 840 Trademark |    Corrupt Organizations |
|    Student Loans | ☐ 340 Marine    Injury Product | | | ☐ 480 Consumer Credit |
|    (Excludes Veterans) | ☐ 345 Marine Product    Liability | **LABOR** | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment |     Liability   **PERSONAL PROPERTY** | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ |
|    of Veteran's Benefits | ☐ 350 Motor Vehicle   ☐ 370 Other Fraud |    Act | ☐ 862 Black Lung (923) |    Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle   ☐ 371 Truth in Lending | ☐ 720 Labor/Management | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 190 Other Contract |     Product Liability   ☐ 380 Other Personal |    Relations | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal    Property Damage | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 196 Franchise |     Injury   ☐ 385 Property Damage | ☐ 751 Family and Medical | | ☐ 895 Freedom of Information |
| | ☐ 362 Personal Injury -    Product Liability |    Leave Act | |    Act |
| |     Medical Malpractice | ☐ 790 Other Labor Litigation | | ☐ 896 Arbitration |
| **REAL PROPERTY** | **CIVIL RIGHTS**   **PRISONER PETITIONS** | ☐ 791 Employee Retirement    Income Security Act | **FEDERAL TAX SUITS** | ☐ 899 Administrative Procedure |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights   **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff |    Act/Review or Appeal of |
| ☐ 220 Foreclosure | ☐ 441 Voting   ☐ 463 Alien Detainee | |    or Defendant) |    Agency Decision |
| ☒ 230 Rent Lease & Ejectment | ☐ 442 Employment   ☐ 510 Motions to Vacate | | ☐ 871 IRS—Third Party | ☐ 950 Constitutionality of |
| ☐ 240 Torts to Land | ☐ 443 Housing/     Sentence | |    26 USC 7609 |    State Statutes |
| ☐ 245 Tort Product Liability |     Accommodations   ☐ 530 General | | | |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities -   ☐ 535 Death Penalty | **IMMIGRATION** | | |
| |     Employment   **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 446 Amer. w/Disabilities -   ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | |
| |     Other   ☐ 550 Civil Rights |    Actions | | |
| | ☐ 448 Education   ☐ 555 Prison Condition | | | |
| |   ☐ 560 Civil Detainee - | | | |
| |     Conditions of | | | |
| |     Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original
Proceeding

☐ 2 Removed from
State Court

☐ 3 Remanded from
Appellate Court

☐ 4 Reinstated or
Reopened

☐ 5 Transferred from
Another District
*(specify)*

☐ 6 Multidistrict
Litigation

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. 1332

Brief description of cause:
Breach of Lease Contract

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION**
UNDER RULE 23, F.R.Cv.P.

DEMAND $ 718,081.85

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions)*
JUDGE _____   DOCKET NUMBER _____

DATE
01/30/2014

SIGNATURE OF ATTORNEY OF RECORD
*Kristy Castagna*

FOR OFFICE USE ONLY

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

## UNITED STATES DISTRICT COURT

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.**

Address of Plaintiff: __157 Bala Avenue Bala Cynwyd, PA__

Address of Defendant: __641 Danbury Road Ridgefield, CT 06877__

Place of Accident, Incident or Transaction: __157 Bala Avenue Bala Cynwyd, PA__
*(Use Reverse Side For Additional Space)*

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?
(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))   Yes☐  No☒

Does this case involve multidistrict litigation possibilities?   Yes☐  No☐
*RELATED CASE, IF ANY:*
Case Number: _____   Judge _____   Date Terminated: _____

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?   Yes☐  No☒

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?   Yes☐  No☒

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?   Yes☐  No☒

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?   Yes☐  No☒

CIVIL: (Place ✔ in ONE CATEGORY ONLY)

A. *Federal Question Cases:*

1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☐ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations
7. ☐ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☐ All other Federal Question Cases
   (Please specify) _____

B. *Diversity Jurisdiction Cases:*

1. ☒ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability — Asbestos
9. ☐ All other Diversity Cases
   (Please specify)

## ARBITRATION CERTIFICATION
*(Check Appropriate Category)*

I, __Kristy M. Castagna, Esquire__, counsel of record do hereby certify:

☒ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;

☐ Relief other than monetary damages is sought.

DATE: __1/30/14__     _Kristy Castagna_     __206740__
                      Attorney-at-Law        Attorney I.D.#

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: __1/30/14__     _Kristy Castagna_     __206740__
                      Attorney-at-Law        Attorney I.D.#

CIV. 609 (5/2012)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### CASE MANAGEMENT TRACK DESIGNATION FORM

| | | |
|---|---|---|
| Sotolidis, Constantine, Sotolidis, Isaak and Sotolidis, Irene<br>157 Bala Avenue, Bala Cynwyd, PA | : | CIVIL ACTION |
| v. | : | |
| BTC Holdings 432, LLC<br>c/o Bow Tie Cinemas, LLC, 641 Danbury Road, Ridgefield, CT 06877 | : | |
| BTC Venture 18, LLC<br>c/o Bow Tie Cinemas, LLC, 641 Danbury Road, Ridgefield, CT 06877 | : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.)  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

## SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.      ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health and Human Services denying plaintiff Social Security Benefits.      ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.      ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from exposure to asbestos.      ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are commonly referred to as complex and that need special or intense management by the court.  (See reverse side of this form for a detailed explanation of special management cases.)      ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.      (x )

| | | |
|---|---|---|
| 1/30/14 | _Kristin Castagna_ | Plaintiff's<br>Sotolidis, Constantine, Sotolidis, Isaak and Sotolidis, Irene |
| **Date** | **Attorney-at-law** | **Attorney for** |
| 610.275.2000 | 610.275.2018 | kcastagna@kanepugh.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

**KANE, PUGH, KNOELL, TROY & KRAMER LLP**
BY: KRISTY M. CASTAGNA, ESQUIRE
ATTORNEY I.D. NO. 206740
510 SWEDE STREET
NORRISTOWN, PA 19401                                    Attorney for Plaintiffs
(610) 275-2000

---

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CONSTANTINE SOTOLIDIS, | : | |
| ISAAK SOTOLIDIS and | : | |
| IRENE SOTOLIDIS | : | |
| 157 Bala Avenue, | : | |
| Bala Cynwyd, PA | : | CIVIL ACTION NO.: |
| | : | |
| Vs. | : | JURY DEMANDED |
| | : | |
| BTC HOLDINGS 432, LLC | : | |
| c/o Bow Tie Cinemas | : | |
| 641 Danbury Road, | : | |
| Ridgefield, CT 06877 | : | |
| | : | |
| and | : | |
| | : | |
| BTC VENTURE 18, LLC | : | |
| c/o Bow Tie Cinemas | : | |
| 641 Danbury Road, | : | |
| Ridgefield, CT 06877 | : | |

---

**COMPLAINT**

**I.    Parties:**

1.      Plaintiffs Constantine Sotolidis, Isaak Sotolidis and Irene Sotolidis are adult individuals with a place of business located at 157 Bala Avenue, Bala Cynwyd, Montgomery County, Pennsylvania

2.      Defendant BTC Holdings 432, LLC is a Delaware limited liability company having an address of c/o Bow Tie Cinemas, LLC, 641 Danbury Road, Ridgefield, CT 06877.

3.      Defendant BTC Venture 18, LLC is a Delaware limited liability company having an address of c/o Bow Tie Cinemas, LLC 641 Danbury Road, Ridgefield, CT 06877.

## II.   Jurisdiction:

4.      This action is a civil action where jurisdiction is founded upon diversity of citizenship, the amount in controversy being in excess of $75,000 exclusive of interest and costs as specified in 28 U.S.C.A. §1332.

## III.   Statement of Claim:

5.      Plaintiffs are the owners of a building located at 157 Bala Avenue, Bala Cynwyd, Montgomery County, Pennsylvania (hereinafter "Bala Theater").

6.      On or about August 13, 1998, Plaintiffs, as Landlords, executed a 20 year lease for the Bala Theater with CCC Bala Cynwyd Cinema Corp. (hereinafter "CCC") as Tenant.  A copy of the Lease Agreement is attached here as Exhibit "A".

7.      On or about April 30, 2013, CCG Holdings, LLC, the corporate successor of CCC assigned the entirety of its lease in the Bala Theater to Defendant BTC Holdings 432, LLC.  A copy of the Assignment Agreement is attached hereto as Exhibit "B".

8.      The Lease Assignment contained a guaranty by Defendant BTC Venture 18, LLC.  See Exhibit B.

11.     Defendant BTC Holdings 432, LLC has defaulted under the terms of the lease agreement by failing to pay rent, taxes, insurance and utilities.

12.     Because of the default, on December 12, 2013, Plaintiffs exercised their right under the lease to demand acceleration of all rent due for the unexpired term of the lease.  Copies of the December 12, 2013 letters to Defendants are attached as Exhibit "C".

13.     To date, Plaintiffs have received no payment and Defendant BTC Holdings 432, LLC remains in default under the lease.

14.     The unpaid rent owed by Defendant BTC Holdings 432, LLC is itemized as follows:

> Unpaid rent to date (Nov. 2013 to present): $32,000.00
> Rent for unexpired term of lease: $550,000.00
> Additional Rent under lease:
> - Unpaid 2013 Taxes: $11,566.07
> - Taxes for 2014-2018: $60,508.44
> - Unpaid 2013 Insurance premiums: $5,895.00
> - Insurance premiums from 2014-2018: $23,580.00
> - Unpaid Sewer fee: $3,405.77
> - Estimated Sewer fees for 2014-2018: $12,000
> - Unpaid Water bills: $2,326.57
> - Estimated Water bills: $16,800.00

Total due: $718,081.85

15.     Defendant BTC Venture 18, LLC is liable for all damages sustained by Plaintiffs as a result of the default by virtue of the guaranty.

16.     Defendants BTC Holdings 432, LLC and BTC Venture 18, LLC owe damages to Plaintiffs in the amount of  $718,081.85 plus costs, interest and attorney fees as provided by the lease.

WHEREFORE, Plaintiffs demand judgment in the amount of $718,081.85 plus costs, interest and attorney fees.

Respectfully submitted,
KANE, PUGH, KNOELL, TROY & KRAMER, LLP

By:     _____
KRISTY M. CASTAGNA, ESQUIRE
ID# 206740
Kane, Pugh, Knoell, Troy & Kramer
510 Swede Street
Norristown, PA 19401
Phone - (610) 275-2000
Fax - (610) 275-2018

Exhibit "A"

## COMMERCIAL LEASE AGREEMENT

LESSORS:  Irene Sotolidis, Constantine Sotolidis,
and Isaak V. Sotolidis
LESSEES:  CCC Bala Cynwyd Cinema Corp. and Clearview Cinema
Group, Inc.
PREMISES: 157 Bala Avenue, Bala Cynwyd, Pennsylvania 19004

## CONTENTS

Introduction................................................1

Paragraph 1:   Inability to Give Possession..............2

Paragraph 2:   Real Estate Taxes and Other
Additional Rent:..........................2

Paragraph 3:   Water Rent, Sewer Rent, and Utilities......4

Paragraph 4:   Affirmative Covenants of Tenant...........4

Paragraph 5:   Negative-Covenants of Tenant..............7

Paragraph 6:   Lessor's Rights..........................10-A

Paragraph 7:   Liability.................................11

Paragraph 8    Condemnation; Destruction.................13

Paragraph 9:   Liability Insurance......................16

Paragraph 10:  Remedies of Landlord.....................16

Paragraph 11:  Further Remedies of Landlord.............19

Paragraph 12:  Ejectment................................20

Paragraph 13:  Affidavit of Default.....................21

EXHIBIT "A"

Paragraph 14        Attorney's Fees...........................21

Paragraph 15:       Remedies Cumulative.......................21

Paragraph 16:       Brokerage/Leasing.........................21

Paragraph 17:       Security Deposit..........................21

Paragraph 18:       Subordination.............................22

Paragraph 19:       Zoning & Permits..........................22

Paragraph 20:       Condition of Premises.....................23

Paragraph 21:       Lawful Use of Premises....................23

Paragraph 22:       Conduct of Custom.........................24

Paragraph 23:       Heating and Air Conditioning Maintenance...24

Paragraph 24:       Termination of Landlord's Liability.......24

Paragraph 25:       Notices...................................25

Paragraph 26:       Lease Contains all Agreements.............25

Paragraph 27:       Heirs and Assignees.......................25

Paragraph 28:       Headings Not Part of Lease................26

Paragraph 29:       Severability..............................26

Paragraph 30:       No Reservation or Option..................26

Paragraph 31:       Mechanic's Liens..........................26

Paragraph 32:       No Recordings.............................27

Paragraph 33:       Time of Essence...........................28

Paragraph 34:       Authority.................................28

Paragraph 35:       Governing Law.............................28

Paragraph 36:       Brokerage.................................28

Paragraph 37:       Exhibits and Riders.......................28

Paragraph 38:   Opportunity to Consult Attorney...........28

Paragraph 39:   Option to Renew Lease.....................29

Paragraph 40:   Landlord's Office.........................29

Signature Page.........................................30

Plot Plan...................................Exhibit "A"

Confession of Judgment Disclosure Statement......Exhibit "B"

## LEASE AGREEMENT

THIS LEASE AGREEMENT, made this       day of August, 1998, by and between CONSTANTINE SOTOLIDIS, ISAAK SOTOLIDIS, and IRENE SOTOLIDIS, 113 Glendale Road, Upper Darby, Pennsylvania 19082 (hereinafter collectively referred to as "Landlord") and CCC BALA CYNWYD CINEMA CORP., a Delaware corporation authorized to do business in the Commonwealth of Pennsylvania, 97 Main Street, Chatham, New Jersey 07928. (hereinafter collectively referred to as "Tenant").

WITNESSETH:  Landlord hereby leases to Tenant and Tenant hereby rents from Landlord all that certain 157 BALA AVENUE, FIRST FLOOR, SECOND FLOOR PROJECTION ROOM, BATHROOM AND TWO STOCK ROOMS, THIRD FLOOR OLD PROJECTION BOOTH, AND BASEMENT, (EXCLUDING SECOND FLOOR OFFICE OVER FRONT BOX OFFICE AND THIRD FLOOR TWO CLOSETS), TOWNSHIP OF BALA CYNWYD, MONTGOMERY COUNTY, COMMONWEALTH OF PENNSYLVANIA, more particularly described in Exhibit "A", attached hereto and made a part hereof (hereinafter referred to as "Demised Premises" or "Premises") (and the NON-EXCLUSIVE right to the use of the parking lot), to be used and occupied only as a THREE-SCREEN MOVIE THEATER and for related ancillary purposes, for the primary term (Term) of TWENTY (20) YEARS and NINETEEN (19) DAYS, commencing on the 13TH DAY OF AUGUST, 1998 (Commencement Date) and ending on the 31ST DAY OF AUGUST, 2018, for the minimum term rental of ONE MILLION NINE HUNDRED FIFTY THREE THOUSAND EIGHT HUNDRED AND 64/XX ($1,953,830.64) DOLLARS (minimum term rental), lawful money of the United States of America; which shall be payable without prior notice or demand, and without any set-off, deduction or counterclaim, at Landlord's address set forth above or at such other place as Landlord may direct Tenant by written notice during the Term of this Lease, or any renewal or extension thereof, in advance in equal monthly installments as follows:

| | | |
|---|---|---|
| 8/13/98 to 8/31/98: | $3,830.64 | |
| 9/1/98 to 8/31/03: | $75,000.00/year | ($6,250.00/mth) |
| 9/1/03 to 8/31/08: | $90,000.00/year | ($7,500.00/mth) |
| 9/1/08 to 8/31/13: | $105,000.00/year | ($8,750.00/mth) |
| 9/1/13 to 8/31/18: | $120,000.00/year | ($10,000.00/mth) |

said payments to be paid on the FIRST DAY of each month (except the first payment of $3,830.64 shall be paid at the time of signing of this Lease Agreement), commencing SEPTEMBER 1, 1998, Tenant shall have a FIVE (5) DAY grace period in which to make payment.  In the event Tenant does not pay said rent within the aforesaid grace period, Tenant shall pay, in addition to the

monthly rent, a late charge of FIVE (5%) PERCENT of the amount due and owing at that time. No notice to cure is required for the payment of the said monthly minimum rental charge.  The first monthly installment to be paid at the time of signing of this Lease.

PROVIDED, HOWEVER, the should this Lease be continued for a further period under the same terms, provisions and conditions contained herein as set forth above, hereinabove mentioned, any allowances given Tenant on Rent (as hereinafter defined) during the Term shall not extend beyond the Term.  If Tenant shall give notice, as stipulated in this Lease, of its intention to vacate the demised premises at the end of the then current term, and shall fail or refuse to so vacate the demised premises, then it is expressly agreed that Landlord shall have the option to either (a) disregard Tenant's termination notice, in which case all the terms provisions and conditions of this Lease shall continue thereafter with full force and effect as if such termination notice from Tenant had not been given, or (b) at any time within thirty (30) days after the date upon which Tenant failed or refused to vacate the demised premises, give Tenant ten (10) days' written notice of Landlord's termination of this Lease, whereupon Tenant shall vacate the demised premises at the expiration of the ten (10) day period specified in Landlord's termination notice.  All powers, authorities, remedies and benefits granted to Landlord under this Lease may be exercised by Landlord and all obligations imposed upon and covenants made by Tenant under this Lease shall be performed by Tenant as well during any extension of the original Term of this Lease as during the original Term itself.

1.  <u>INABILITY TO GIVE POSSESSION:</u>  If the Landlord is unable to give Tenant possession of the demised premises on the Commencement Date by reason of any other cause beyond the control of Landlord, then Landlord shall not be subject to any liability to Tenant by reason of such delay, and during the period that Landlord is unable to give Tenant possession of the demised premises, all rights and remedies of both parties hereunder shall be suspended.  In such event, (a) the Term of this Lease shall begin on such date as possession of the demised premises shall be tendered by Landlord to Tenant, (b) Rent hereunder shall commence as of the date of such tender of possession to Tenant, (c) the expiration date of the Term of this Lease shall not be affected thereby, and (d) such failure to give possession shall not affect the validity of this Lease or any of the obligations and covenants of Tenant hereunder.

2.  <u>REAL ESTATE TAXES AND OTHER ADDITIONAL RENT:</u>

(a)  <u>Real Estate Taxes:</u>  Tenant shall also pay to Landlord, as Additional Rent, an amount equal to SEVENTY-FIVE (75%) PERCENT of the total real estate taxes and any increases thereof, for the entire property of which the Demised Premises are a part.

(2)

(b) <u>Landlord's Insurance:</u> Tenant shall also pay to Landlord, as Additional Rent, an amount equal to SEVENTY-FIVE (75%) PERCENT of the total insurance premium costs for Landlord's policy of insurance for public liability in an amount not less than ONE MILLION AND 00/XX ($1,000,000.00) DOLLARS on an account of bodily injuries to or death of one person and ONE MILLION AND 00/XX ($1,000,000.00) DOLLARS on account of bodily injuries to or death or more than one person as a result of any one accident or disaster and ONE MILLION AND 00/XX ($1,000,000.00) DOLLARS on account of property damage.

(c) <u>Other Charges:</u> Tenant shall also pay to Landlord, as Additional Rent, upon presentation of bills therefor by Landlord, all taxes, liens, assessments, charges, levies imposts of every kind and nature, ordinary or extraordinary, foreseen or unforeseen, general or special, levied, assessed or imposed by any governmental authority or and/or with respect to the demised premises or the building or shopping center of which the demised premises are a part or its related land, for each year during the Term of this Lease or any renewal or extension thereof, or any portion thereof, in excess of those imposed as of the date of this Lease; provided, however, that if the demised premises are only a part of larger premises, land or building assessed for tax purposes as an entirety. Tenant shall be obliged to pay only that proportion of such taxes in excess of those imposed during the base year as the leasable area of the demised premises bears to the total leasable area of such larger premises, land or building.

Tenant shall also pay to Landlord, as Additional Rent, any and all sums which may become due by reason of the failure of Tenant to comply with any of the provisions of this Lease and any and all damages, costs and expenses (including, but not limited to, attorneys' fees) which Landlord may suffer or incur by reason of any default of Tenant hereunder or failure on Tenant's part to comply with the provisions of this Lease, and each of them, and also any and all costs and expenses of repairing all damages to the demised premises caused by any act or neglect of Tenant, its agents, employees servants, officers, invitees, customers, and guests.

Minimum rent, all Additional Rent and all other sums payable by Tenant to Landlord hereunder are included in and shall be deemed to be "Rent" payable by Tenant under this Lease. All Rent shall be payable in lawful United States currency without prior notice or demand, at Landlord's address set forth above or at such other address as Landlord may from time to time designate by notice in writing to Tenant. Payments of Rent which are made on a monthly basis shall be made in advance on the first day of each month of the Term or any renewal or extension thereof (unless another day of each month is specified above), and all other payments on account of Rent shall be made within thirty (30) days after delivery of an invoice or notice therefor by Landlord to Tenant.

3.   WATER RENT, SEWER RENT, AND UTILITIES:   Tenant shall pay, as Additional Rent, all charges for sewer, trash, gas, electricity, hot and cold water, heat and any and all other utilities utilized at the demised premises (Tenant shall pay for such utilities either directly to the public utility supplying same, if a separate meter is installed upon the demised premises and a separate bill is rendered by such utility to Tenant, or to Landlord, if a submeter or no meter is installed upon the demised premises).

Landlord shall not be liable in any way to Tenant for any failure or defect in the supply or character of electric energy furnished on the demised premises by reason of any requirement, act or omission of the public utility serving the demised premises or the building of which the demised premises are a part with electricity or by reason of any defect, failure or breakdown in, by or of any electric transformer serving the demised premises or the building of which the demised premises are a part.  Tenant's use of electric energy in the demised premises shall not at any time exceed the capacity of any of the electric conductors and equipment in or otherwise serving the demised premises.  In order to insure that such capacity is not exceeded and to avert possible adverse effect upon the building electric service, Tenant shall not, without Landlord's prior written consent in each instance, connect to the building electric distribution system any fixtures, appliances or equipment other than lamps, typewriters and similar small office machines which operate on a voltage in excess of 110 or make any alterations or additions to the electric system of the demised premises.  Should Landlord grant each consent, all additional risers or other equipment required therefor shall be provided by Landlord and all costs and expenses thereof shall be paid by Tenant as Additional Rent upon Landlord's demand.

4.   AFFIRMATIVE COVENANTS OF TENANT:   Tenant covenants and agrees that Tenant shall, without notice or demand, and at Tenant's sole cost and expense:

(a)   Payment of Rent:   Pay the Rent on the days and times and at the place that the same are made payable, without fail, and if Landlord shall at any time or times accept any Rent after the same shall have become due and payable, such acceptance shall not excuse delay by Tenant upon subsequent occasions, and shall not constitute or be construed as a waiver of any of Landlord's rights hereunder, including, but not limited to, the right to receive timely payment of Rent from Tenant.  Tenant agrees that any charge or payment herein reserved, included, or agreed to be treated or collected as Rent and/or any other charges or taxes expenses, or costs herein agreed to be paid by Tenant, may proceeded for and recovered by Landlord by distraint or other process in the same manner as Rent due and in arrears.

(b)   Cleaning, Repairing, etc:   Keep the demised premises and parking lot in good order and repair and clean and free from all ashes, dirt and other refuse matter; repair and/or replace all

broken glass windows, doors, etc. located in or about the demised premises; keep all waste and drain pipes free of debris and open and running; repair all damage to the plumbing, interior walls and surfaces (including the interior surfaces of exterior walls), floors and all other parts of the demised premises, and keep the same in good order and repair, reasonable wear and tear and damage by the elements or other insured casualty not occurring through act or negligence of Tenant or Tenant's agents, employees, servants, officers, customers or invitees, alone excepted.  Tenant shall be responsible for the cost and expense of all repairs, maintenance and replacements ordinary as well as extraordinary, foreseen as well as unforeseen, necessary to maintain the demised premises in good repair and condition, and all repairs, maintenance and replacement, when necessary shall be performed by Tenant in a good and workmanlike manner, and shall be equal in quality and class to the original work, including but not limited to fixtures, equipment, interior and exterior walls. Tenant shall replace all glass in the demised premises that is broken, damaged or destroyed in any manner whatever, the Tenant assuming all responsibility for the glass in the demised premises.  If required by Landlord during the Term, Tenant shall, at its sole cost and expense, purchase a plate glass insurance policy and shall deliver to Landlord a copy of the policy or a certificate showing such insurance in force.

Tenant shall keep and maintain the sidewalks, walkways, and parking lot adjoining the demised premises in good repair and free from accumulations of trash, debris, and snow and ice.  Without limiting the foregoing.  Tenant shall remove the snow and ice from the parking lot. Tenant shall utilize rock salt and/or cinders on such sidewalks after removing the snow therefrom so that no ice may accumulate on such sidewalks and shall repair any uneven pavement on such sidewalks and walkways with the use of cement or other necessary materials, and shall perform such other necessary maintenance so as to reduce or eliminate the risk that a person may slip and fall on any such sidewalks and walkways.

Tenant shall peaceably deliver up and surrender possession of the demised premises to Landlord at the expiration or sooner termination of the Term of this Lease, broom clean and in the same condition in which Tenant has agreed to keep the same during continuance of the Term of this Lease, promptly delivering to Agent at its office all keys for the demised premises.

In the event of Tenant's failure to make any necessary repairs, immediately upon receipt of notice from Landlord, Landlord may, at Landlord's option, make such repairs for the account of Tenant and collect the cost thereof as Additional Rent from Tenant in any manner herein permitted for the collection of Rent due and in arrears.

(c)  Exterminating:  Tenant shall contract with a reputable exterminating and trash removal company to provide service to the

demised premises and shall, upon the request of Landlord, provide Landlord with a copy of such contract.

(d) <u>Requirements of Public Authorities</u>: Comply promptly with all laws, ordinances, statutes, notices, requirements, orders, rules, regulations and recommendations (whatever the nature thereof may be) of any and all of the federal, state, county, township, municipal, local and/or other governmental authorities having jurisdiction over the demised premises or Tenant's occupancy of the demised premises, and of the Board of Fire Underwriters, and of any insurance organizations or associations and/or companies, with respect to the demised premises and Tenant's use and occupancy thereof, and any property appurtenant thereto and (if any portion of the demised premises is located on the ground or street floor) the sidewalks and curbs adjacent to same; and Tenant shall not knowingly do or commit, or suffer to be done or committed anywhere upon the demised premises, any act or thing contrary to any of the laws, ordinances, statues, notices, requirements, orders, rules, regulations and recommendations hereinabove mentioned. Tenant shall secure and maintain in effect any governmental approvals, licenses and permits as may be required for Tenant's use and occupancy of the demised premises in accordance with the provisions of this Lease.

(e) <u>Fire</u>: Use every reasonable precaution against fire and any other casualty in or about the demised premises. Tenant shall install and keep during the term of this Lease, and any extensions thereof, fire extinguishing devices (fire extinguisher) approved by the Landlord and the Fire Marshal of the either the Township of Bala Cynwyd, County of Montgomery, Commonwealth of Pennsylvania, or a fire insurance rating organization, and shall keep these devices under services as required by the said Fire Marshall or fire insurance rating organization. If Tenant fails to install said fire extinguishing device, Landlord shall have the right to enter the Demised Premises to make the necessary installation and charge the cost of such installation to Tenant as Additional Rent.

(f) <u>Rules and Regulations</u>: Comply with all rules and regulations of Landlord reasonably promulgated as hereinafter provided.

(g) <u>Notice to Landlord</u>: Give to Landlord prompt written notice (within 24 hours of occurrence unless a dangerous or emergency condition exists in which case Tenant agrees to immediately notify Landlord by telephone or by wire, an emergency would include, but not be limited to, broken glass, roof leak, broken pipe broken or damaged door, accumulated snow or ice in the parking areas serving the demised premises and all driveways entrances, curbs and exits thereto) of (1) any accident, fire, damage, dangerous or emergency condition occurring on or to the demised premises the building of which the demised premises are a part and its related land, (2) any breakage, dangerous or emergency condition, defects in or need for repairs to the roof,

wires, heating, ventilating and air conditioning or plumbing apparatus or other systems or apparatus in or about the demised premised, or the parking lot, sidewalk and curbs adjacent to the demised premises, and (3) any accumulation of snow or ice or other dangerous or emergency condition (including, but not limited to, uneven pavement and cracks in pavement) on the parking areas serving the demised premises and all driveways, entrances, curbs and exits thereto.

(h)  Business Operation:  Keep its business open to the public and in active operation during such business hours as may be customary and usual in the vicinity in which the demised premises are located, and cause the same to continuously be reasonably stocked and serviced by Tenant's employees and servants.

5.  NEGATIVE-COVENANTS OF TENANT:  Tenant covenants and agrees that Tenant shall do none of the following without the prior written consent of Landlord, which consent Landlord may not be unreasonably withheld:

(a)  Use of Premises:  Use or occupy or permit the use or occupancy of the demised premises for any other purpose or in any manner other than as permitted herein.  Use or occupy or permit the use or occupancy of the demised premises in a manner which creates a safety hazard, which would be dangerous to the demised premises, the building in which same are located its related land or the occupants of same.  Exhibit, sell or offer for sale in or on the demised premises any article or thing except those articles and things connected with the permitted use of the demised premises set forth herein.  Use the demised premises for housing accommodations or lodging or sleeping purposes.

(b)  Assignment and Subletting:  Tenant shall not voluntarily, involuntarily, or by operation of law, assign transfer, mortgage or otherwise encumber (herein collectively referred to as an "assignment") this Lease or any interest of Tenant herein, in whole or in part, nor sublet the whole or any part of the Demised Premises, nor permit the Demised Premises or any part hereof to be used or occupied by others without first obtaining in each and every instance the prior written consent of Landlord, which consent shall not be unreasonably withheld.  Any consent by Landlord to an assignment or subletting or use or occupancy by others shall be held to apply only to the specific transaction thereby authorized and shall not constitute a waiver of the necessity for such consent for any subsequent assignment or subletting or use or occupancy by others, including but not limited to a subsequent assignment or subletting by any trustee, receiver, liquidator or personal representative of Tenant, nor shall the references anywhere in this Lease to Subtenants, licensees and concessionaires be construed as a consent by Landlord to an assignment.  If this Lease or any interest herein be assigned or if the Demised Premises or any part thereof be sublet or used or occupied by anyone other than Tenant without

Landlord's prior written consent having been obtained thereto, Landlord may nevertheless collect Rent from the assignee, sublessee, user or occupant, and apply the net amount collected to the rents herein reserved, and furthermore in any such event Tenant shall pay to Landlord monthly, as additional rent, the excess of the consideration received or to be received during such month, for such assignment, sublease or occupancy (whether or not denoted as rent) over the rental reserved for such month in this Lease applicable to such portion of the Demised so assigned, sublet, or occupied. No such assignment, subletting, use, occupancy, or collection shall be deemed a waiver of the covenant herein against assignment, subletting or use or occupancy by others, or the acceptance of the assignee, Subtenant, user or occupant as tenant hereunder, or constitute a release of Tenant from the further performance by Tenant of the terms and provisions of this Lease. Landlord's prior written consent shall not be required for any subletting or assignment which would otherwise occur by operation of law, merger, stock transfer, consolidation, reorganization, transfer or other change of Tenant's corporate or proprietary structure. Moreover, Landlord's consent shall not be necessary for an assignment or sublease whereby: (i) the net worth of the assignee or Subtenant remains substantially the same or be enhanced thereby; (ii) the management experience of the assignee or Subtenant remains substantially the same or be enhanced thereby; and (iii) the assignee or Subtenant expressly agrees to comply with all the terms and provisions of this Lease.

Notwithstanding the foregoing, Tenant shall have the right without Landlord's approval to assign this Lease or sublet the Demised Premises to any affiliate of Tenant, "affiliate" being defined as any entity controlling, controlled by or under common control with Tenant, assuming the three (3) criteria enumerated at the end of the above paragraph are met.

Any permitted assignment of this Lease shall be effective only if and when an agreement is delivered to Landlord whereby, as stated above in the first paragraph of this subsection, assignee assumes and agrees to keep and perform all of the terms and provisions in this Lease accruing from and after the date of such assignment. Except with regard to an assignment pursuant to the second paragraph of this subsection, Tenant shall be deemed absolutely and irrevocably released from any and all liability or obligation, thereafter accruing under this Lease upon any such assignment, subletting or other transfer.

(c) Signs; Outside Displays:  Place or allow to be placed any stand, booth, sign, show case, projection or device upon the doorsteps, vestibules or outside walls or pavements of the demised premises, or paint, place, erect or cause to be painted, placed or erected any sign, projection or device on or in any part of the demised premises, excepting marquee sign, movie posters, and other signage customarily used in the movie theater business. Tenant shall, at the same time that Tenant requests Landlord for its consent, submit plans and specifications for such sign to Landlord

for Landlord's approval. All permitted stands, booths, signs, show cases, projections and devices shall be installed by Tenant in a good and workmanlike manner and at Tenant's sole cost and expense, and shall comply with all applicable laws and ordinances and to the sign standards as are then established by Landlord generally. If requested to do so by Landlord, Tenant shall remove any permitted stand, booth, sign show case, projection or device painted or erected on or about the demised premises, and shall, at its sole cost and expense, restore the demised premises to their former condition, at the expiration or sooner termination of the Term of this Lease. In case of the breach of this covenant (in addition to all other remedies given to Landlord in case of the breach of any conditions, covenants or provisions of this Lease), Landlord shall have the privilege of removing said stand, booth, sign, show case, projection or device, and restoring the demised premises to their former condition, and Tenant shall be liable to and shall pay Landlord, as Additional Rent, any and all expenses so incurred by Landlord.

(d) <u>Alterations, Improvements:</u> Make any material alterations, improvements, or additions to, or install any building fixtures in or on the demised premises. Any material alterations, improvements, additions or physical changes made by Tenant in, upon or outside the Demised Premises as covered by this Lease must be approved by Landlord, in writing, and copies of all plans must be provided. ANY CONTRACTORS HIRED BY TENANT TO MAKE ANY ALTERATIONS, IMPROVEMENTS, ADDITIONS, OR PHYSICAL CHANGES TO THE DEMISED PREMISES, MUST BE LICENSED IN THE TOWNSHIP OF BALA CYNWYD, AND HAVE ADEQUATE INSURANCE. All alterations, improvements, additions or building fixtures, whether installed before or after the execution of this Lease, which shall remain upon the demised premises at the expiration or sooner termination of the Term of this Lease shall become the property of Landlord, unless Landlord shall, prior to the expiration or sooner termination of the Term of this Lease, have given written notice to Tenant to remove the same, in which event Tenant shall, at its sole cost and expense, remove such alterations, improvements, additions or building fixtures and restore the demised premises to the same good order and condition in which they were prior to making of such alterations, improvements or additions or the installation of such building fixtures, ordinary wear and tear excepted. Should Tenant fail so to do, Landlord may do so, collecting, at Landlord's option, the cost and expense thereof from Tenant as Additional Rent.

(e) <u>Machinery:</u> Use or operate any machinery that, in Landlord's reasonable opinion, is harmful to the demised premises or the building in which the demised premises are located or is disturbing to any other tenant occupying any other portion of the building.

(f) <u>Weights:</u> Place any weight in any portion of the demised premises beyond the safe carrying capacity of the floors and

structure of the demised premises the building in which same are located.

(g) <u>Fire Insurance:</u>  Do or suffer to be done, any act, matter or thing objectionable to the fire or other insurance companies or in violation of the provisions of the fire insurance policies or any other insurance policies now in force or hereafter to be placed on the demised premises, or any part thereof, or on the building of which the demised premises may be a part, whereby any such policy shall become void, invalid or suspended, or whereby the same shall be rated as a more hazardous risk than at the date of this Lease; or employ any person or persons objectionable to the fire or other insurance companies; or carry or have any benzine, gasoline, kerosene or naphtha or any other explosive or rapidly burning matter of any kind in or about the demised premises or the building of which the demised premises are a part.  If Tenant breaches any of the covenants contained in this subparagraph (g) (in addition to all other remedies given to Landlord in case of the breach of any of the provisions of this Lease), Tenant agrees to pay Landlord, as Additional Rent, an amount equal to any and all increase or increases in insurance premium costs for policies carried by Landlord on or in connection with the demised premises, or any part thereof, or on or in connection with the building of which the demised premises may be a part.

(h) <u>Vacate Premises:</u>  Vacate, abandon or desert the demised premises during the Term of this Lease, or permit the same to be empty and unoccupied.

(i) <u>Interference With Other Tenants:</u>  Permit any odor, noise, sound or vibration which may, in Landlord's reasonable judgment, in any way tend to impair the demised premises or the building in which the demised premises are located or interfere with or be disturbing to the business and/or occupancy of the building by any other tenants of Landlord, taking into consideration, however, that Tenant is a movie exhibitor.

(j) <u>Sales at Auction:</u>  Carry on or permit to be carried on my sales at auction in the demised premises.

(k) <u>Goods of Others:</u>  Keep upon the demised premises or attach to the demised premises any goods or chattels acquired under a conditional sale, title to which is reserved in some other person, and Tenant hereby agrees that all goods, property and chattels to be used or kept or to be attached upon the demised premises shall be owned by Tenant or leased by Tenant.

(l) <u>Waste:</u>  Commit waste or permit waste to be committed or allow any nuisance on or in the demised premises or the building in which same are located.

(m) <u>Roof:</u>  Go onto the roof of the demised premises or the building of which the demised premises are a part or perform any

repairs or installation of signs, air-conditioning units, compressors, water towers, ducts, chimneys, etc. on the roof which involve fastenings or piercing in connection with the roof. Landlord reserves the right to use its roofer for all work to be done in connection with the roof. If Tenant or its contractor or agents make such installations on the roof as stated above without the prior written consent of Landlord, Tenant shall immediately become responsible for all repairs or replacements to the roof of the demised premises. Nothing in this subparagraph shall be construed to relieve the Landlord of its liability to maintain the roof on the demised premises if Tenant complies with the provisions of this subparagraph

6.   **LANDLORD'S RIGHTS:**   Tenant covenants and agrees that Landlord and Agent shall have the right, but shall be under no obligation, to do the following things and matters in and about the demised premises during the Term of this Lease and any renewal or extension thereof:

(a)   **Inspection of Premises:**   At all reasonable times by itself, or its duly authorized agents, to go upon and inspect the demised premises and every part thereof, ant/or at its option to make repairs, alterations and additions to the demised premises or the building of which the demised premises are a part or its related land.

(b)   **Rules and Regulations:**   At any time or times and from time to time to make such rules and regulations as in its reasonable judgment may from time to time be necessary for the safety, care, operation and cleanliness of the demised premises or the building of which the demised premises are a part or its related land, and for the preservation of good order therein. Such rules and regulations shall, when notice thereof is given to Tenant, be incorporated into and form a part of this Lease.

(c)   **Sale or Rent Sign, Prospective Purchasers or Tenants:**
To display a "For Sale" sign at any time, and also, after notice

THE REMAINING OF THIS PAGE IS INTENTIONALLY LEFT BLANK AND
IS NUMBERED AS 10-A

(10-A)

from either party of intention to terminate the Term of this Lease or at any time within three months prior to the expiration of the Term of this Lease, to display a "For Rent" sign, or both "For Rent" and "For Sale" signs; and all such signs shall be placed upon such part of the demised premises, building or land as Landlord may elect and may contain such matter as Landlord shall require.   Prospective purchasers or tenants authorized by Landlord may inspect the demised premises at any reasonable time.

(d)   Discontinue Facilities and Services:   Discontinue all facilities furnished and services rendered by Landlord or any of them, not expressly covenanted for herein, it being understood that same constitute no part of the consideration for this Lease.

7.   LIABILITY:

a.   Each party covenants and agrees that the other party, its/their respective officers, employees, servants and agents shall not be liable to the other party and each party hereby releases the other party from any and all liability by reason of any injury or damage to or loss of any person or property in the demised premises, whether belonging to either party, caused by any fire, breakage, deterioration or leakage in any part or portion of the demised premises, or any part or portion of the building of which the demised premises are a part, or from water, rain or snow that may leak into, issue or flow from any part of the demised premises, or of the building of which the demised premises are a part, from the roof, drains, pipes, or plumbing work of the same, or from any place or quarter, or from any other cause whatsoever, unless such injury, damage or loss is caused by or results from the act, omission, or negligence of either party or its/their respective officers, employees, servants, or agents.   Notwithstanding the foregoing or anything contained herein to the contrary, each party or its/their respective officers, employees, servants and agents shall not be liable for any such injury, damage or loss, whether or not same results from negligence by any of such parties, to the extent either party is compensated therefor by its/their respective insurance.

Each party covenants and agrees that the other party its/their respective officers, employees, servants and agents shall not be liable to Tenant and Tenant hereby releases said parties from any and all liability by reasons of any damage or injury to or loss of any person or property which may arise from or be due to the use, misuse, abuse or defects in all or any of the elevators, hatches, openings, stairways, hallways of any kind whatsoever which may exist or hereafter be erected or constructed on the demised premises or the building of which the demised premises are a part or its related land, or from any kind of damage or injury or loss which may arise from any other cause whatsoever on the demised premises or the building of which the demised premises are a part or its related land, unless such damage, injury or loss is caused by or results from the act,

(11)

omission, or negligence of either party, its/their respective employees, servants or agents.  Notwithstanding the foregoing or anything contained herein to the contrary, either party its/their respective officers, employees, servants and agents shall not be liable for any such injury, damage or loss, whether or not same results from negligence by any of such parties, to the extent either party is compensated therefor by its/their respective insurance.

Each party covenants and agrees to relieve, exonerate, indemnify, defend, protect and save the other party, its/their respective employees, officers, servants and agents, harmless from and against any and all claims, actions, demands, expenses, costs, charges, obligations, penalties, orders, judgments, liabilities, losses, suits and damages which may be imposed upon, incurred by or asserted against them or any one of them by reason of (1) any accident or matter occurring on the demised premises, the building of which the demised premises are a part or its related land, causing injury to persons (including loss of life) or damage to property (including but not limited to the demised premises), unless such accident or other matter results from the act, omission, or negligence or otherwise tortious act of either party, its/their respective employees, officers, servants or agents, or results from the failure of either party to perform its/their obligations hereunder, (2) the failure of either party to fully and faithfully perform its/their obligations hereunder and to comply with all of the provisions of this Lease, (3) the negligence or otherwise tortious act of either party, its/their respective employees, servants, officers, agents, contractors, invitees, customers, licensees, or visitors or anyone in or about the demised premises or the building of which the demised premises are a part or its related land on behalf or at the invitation or right of either party, (4) anything whatsoever done in or about or out of the demised premises by either party, its/their employees, servants, officers, agents, contractors, invitees, customers, licensees or visitors or anyone in or about the demised premises or the building of which the demised premises are a part or its related land on behalf or at the invitation or right of either party (including, but not limited to, any work or act done in, on or about the demised premises at the direction of either party or any of such parties, and (5) either party's he use, occupancy, condition or maintenance of the demised premises.

If any such action or proceeding is brought against either party, its/their respective employees, servants, officers or agents by reason of any such claim, the breaching party shall (1) defend such action or proceeding upon written notice from the non-breaching, with counsel approved by the non-breaching party in writing, which approval shall not be unreasonably withheld, and (2) further indemnify, defend and save the non-breaching party, its/their respective employees, servants, officers or agents, harmless from and against all costs, expenses, counsel fees, liabilities, orders and judgments incurred or rendered in or about any such action or proceeding.

b.   The Landlord, their respective employees, servants, officers and agents shall not be liable for loss or interruption of business occurring to the Tenant, arising out of or resulting from any claim of breach of this Lease by Landlord, or of the Lease obligations attributable to Landlord, or their respective employees, servants, officers and agents.

The term "Landlord" as used in this Lease, so far as covenants or agreements on the part of the Landlord are concerned, shall be limited to mean and include only the owner or owners of the Landlord's interest in this Lease at the time in question, and in the event of any transfer or transfers of such interest, the Landlord herein named (and in case of any subsequent transfer, the then transferee) shall be automatically freed and relieved, from and after the date of such transfer, of all liability as respects the performance of any covenants or agreements on the part of the Landlord contained in this Lease thereafter to be performed.

The liability of Landlord under this Lease shall be and is hereby limited to Landlord's interest in the demised premises and no other assets of Landlord shall be affected by reason of any liability which Landlord may have to Tenant or to any other person by reason of this Lease, the execution thereof, or the acquisition of Landlord's interest herein.

c.   Notwithstanding the foregoing or anything contained herein to the contrary, the Tenant shall not be released and shall remain liable for any breach of any of the terms, convenants, or conditions, or as respect to the performance of any covenant or agrement on the part of Tenant contained in this Lease.

8.   Condemnation; Destruction:   In the event that the lot or the building of which the demised premises are a part, or any part thereof, or the demised premises or any part thereof are taken or condemned for a public or quasi-public use, the Term of this Lease shall, as to the part so taken, terminate as of the date title or possession shall vest in the condemnor, and Rent reserved hereunder shall abate as of such date of termination in proportion to the square feet of leased space taken or condemned or shall cease if the entire demised premises be so taken.   In the event of any total or partial taking Landlord shall be entitled to receive the entire award in any such proceeding; and Tenant hereby assigns any and all right, title and interest of Tenant now or hereafter arising in or to any such award or any part thereof, and Tenant hereby waives all claims as against Landlord and as against the condemning authority or party, except that Tenant shall have the right to claim and prove in any such proceeding and to receive any award which may be made, if any, specifically for damages or condemnation of Tenant's movable trade fixtures, equipment and for relocation expenses.   Tenant shall be entitled to reasonable notice from Landlord of the partial or complete termination of the Term of this Lease by reason of the aforesaid.   If the Term of this Lease is not terminated in its entirety after the eminent

(13)

domain proceeding under the aforesaid provisions, (a) Landlord shall promptly commence to repair or restore the demised premises to a tenantable condition for Tenant's uses and complete same with diligence, except for delays caused by (1) Landlord's inability to obtain materials, (2) Acts of God, as said term is legally defined and construed, (3) strikes, fire or weather, (4) acts of governmental authority, or (5) any other cause beyond the control of Landlord; and (b) the minimum rental shall be equitably reduced from and after the date that title vests in the condemnor for the balance of the Term taking into account the character and the amount of the taking.

If the demised premises or any part thereof, or the building of which the demised premises are a part or any part thereof, are condemned or declared unsafe by any duly constituted authority having the power to make such condemnation of such declaration or are the subject of a violation notice or a notice requiring repairs or construction from any such authority, then Landlord may, at Landlord's sole election, cancel and terminate the Term of this Lease, and if Landlord elects to so cancel and terminate the Term of this Lease, Tenant, upon notice from Landlord, shall immediately surrender the demised premises to Landlord in the condition in which Tenant is required to surrender same at the expiration of the Term of this Lease, and the Term of this Lease shall terminate and the Rent reserved hereunder shall be apportioned as of the date of such termination. In such event, Landlord shall be entitled to receive the entire award in any such proceeding; and Tenant hereby assigns any and all right, title and interest of Tenant now or hereafter arising in or to any such award or any part thereof, and Tenant hereby waives all claims as against Landlord herein and as against the authority or party making said condemnation or declaration r giving such violation notice, except that Tenant shall have the right to claim and prove in any such proceeding and to receive any award which may be made, if any, specifically for damages or condemnation of Tenant's movable trade fixtures, equipment and for relocation expenses. Further, Tenant shall make no claim against Landlord by reason of the required surrender of the demised premises.

Tenant agrees to give prompt notice to Landlord of any damage to or destruction of the demised premises or the building of which the demised premises are apart, by fire or other casualty.

If, during the Term, or any renewal or extension thereof, the demised premises or the building of which the demised premises are a part are so damaged by fire or other casualty that in Landlord's reasonable determination the demised premises or building are rendered wholly unfit for occupancy, then, at Landlord's option and upon written notice thereof from Landlord to Tenant given within thirty (30) days after such damage occurs, the Term shall terminate as of the date of the occurrence of such damage, and Tenant shall pay to Landlord Rent apportioned to the date of termination, and Landlord may enter upon and repossess the demised premises without further notice to Tenant. If Landlord does not

elect to terminate the Term as aforesaid, then Landlord shall repair and restore the demised premises and/or the building, within eight (8) months, and Landlord may enter and possess the demised premises for that purpose, and if Tenant is deprived of the demised premises during such repairs and restoration, then Rent shall be equitably reduced, apportioned or suspended and all other affirmative obligations of Tenant under this Lease, including, but not limited to, the obligation to maintain and make repairs to the demised premises and the obligation to occupy the demised premises, shall be suspended during the period of time for such repairs and restoration. If said repairs are not completed within eight (8) months, Tenant may terminate Lease upon thirty (30) days notice.

If, during the Term, or any renewal or extension thereof, the demised premises and/or the building of which the demised premises are a part are so damaged by fire or other casualty that such damage does not render the demised premises or building wholly unfit for occupancy, then Landlord will repair whatever portion, if any, of the demised premises or of the building which may have been damaged within three (3) months, and during such repairs Tenant will continue in possession of the demised premises and Rent shall be equitably reduced, apportioned or suspended during the period of time for such repairs or restoration. If such repairs are not completed within three (3) months, Tenant may terminated Leasae upon thirty (30) days notice.

Notwithstanding any other provisions of this paragraph, if any damage is caused by or results from, the negligence of Tenant, those claiming under Tenant, or their respective employees, servants, officers, agents, contractors, customers or invitees, Rent shall not be reduced, suspended or apportioned and Tenant shall pay, as Additional Rent hereunder upon demand by Landlord, the cost of any repairs and/or restorations made or to be made as a result of such damage.

Tenant acknowledges notice from Landlord that (1) Landlord shall obtain insurance of any kind on Tenant's permitted alterations, improvements or fixtures, or Tenant's property, equipment and furniture, (2) it is Tenant's obligation to obtain such insurance at Tenant's sole cost and expense, and (3) Landlord shall not be obligated to repair any damage thereto or replace the same.

If in the event of any damage to the demised premises and/or the building of which the demised premises are a part, the available insurance proceeds are insufficient to repair and/or restore the building and/or the demised premises, or if any mortgagee of the demised premises and/or the building shall not permit the application of adequate insurance proceeds for repair and/or restoration, or if the casualty not be of the type insured against under standard fire policies with extended type coverage, and Landlord elects not to restore or repair the demised premises, then Landlord shall, within thirty (30) days after Landlord learns

of the insufficiency, denial of permission or non-coverage, notify Tenant of its election not to restore or repair and thereafter the Term shall, at the option of either Tenant or Landlord, terminate as of the date of the occurrence of such casualty, Tenant shall pay to Landlord Rent apportioned to the date of termination, and Landlord may enter upon and repossess the demised premises without further notice to Tenant.

9. <u>LIABILITY INSURANCE:</u> Throughout the Term, Tenant shall, at Tenant's sole cost and expense, keep in full force and effect a policy of comprehensive general public liability and property damage insurance with respect to the demised premises, the sidewalks abounding the demised premises and the business operated by Tenant and any permitted subtenants of Tenant in the demised premises, in which the limits of public liability shall not be less than ONE MILLION AND 00/XX ($1,000,000.00) DOLLARS on an account of bodily injuries to or death of one person and ONE MILLION AND 00/XX ($1,000,000.00) DOLLARS on account of bodily injuries to or death of more than one person as a result of any one accident or disaster and ONE MILLION AND 00/XX ($1,000,000.00) DOLLARS on account of property damage. The policy shall name Landlord, Agent, and at Landlord's request, any mortgagee of all or any portion of the demised premises, the building of which the demised premises are a part or its related land, as named insureds, and shall contain an express waiver of any right of subrogation against Landlord.

Tenant's failure to insure the property, pay the insurance premium, or provide Landlord with a copy of said insurance policy, within TEN (10) DAYS of Landlord's written request to Tenant, shall constitute a default under the terms of this Lease. Proof of payment of the annual premium shall be furnished to Landlord or their agent, immediately upon request by Landlord. It is agreed that Tenant will not commence operation of the business until proof of insurance is given to Landlord. Landlord and Tenant hereby waive any right of subrogation against each other on behalf of any and all insurers providing insurance required pursuant to the provisions of this Lease.

At Landlord's option, Landlord may elect to obtain for itself any or all of the forms of insurance required to be obtained by Tenant pursuant to this paragraph if Tenant fails to procure same. If Landlord shall so elect, Tenant shall pay to Landlord, as Additional Rent upon demand, for the cost of all insurance so obtained by Landlord.

10. <u>REMEDIES OF LANDLORD:</u>

It shall be an "Event of Default" under this Lease if Tenant:

(a) Does not pay in full when due any and all

installments of Rent or any other charge or payment
herein reserved, included, or agreed to be treated
or collected as rent and/or any other charge,
expense, or cost herein agreed to be paid by
Tenant; or

(b)   Violates or fails to perform or otherwise breaks
any agreement, covenant or condition herein
contained or fails to comply with any provision of
this Lease; or

(c)   Vacates the demised premises, uses or occupies the
demised premises otherwise as permitted by the
provisions of this Lease, assigns or sublets,
purports to assign or sublet this Lease, the
demised premises or any part thereof otherwise than
in accordance with the provisions of this Lease, or
removes any goods or property from the demised premises
otherwise than in the ordinary and usual course of
business without having first paid and satisfied
Landlord in full for all Rent and other charges
then due or that may thereafter become due until
the expiration of the Term; or

(d)   Tenant or any guarantor of Tenant's obligations
hereunder shall (1) cease doing business as a going
concern, (2) make an assignment for the benefit of
its creditors, (3) generally not pay its debts as
they become due or admit in writing its inability
to pay its debts as they become due, (4) file a
petition commencing a voluntary case under any
chapter of the Bankruptcy Code, 11 U.S.C. 101 et
seq. (the Bankruptcy Code), as amended to date and
from time to time hereafter, (5) be adjudicated an
insolvent, (6) file a petition seeking for itself
any reorganization, arrangement, workout,
composition, readjustment, liquidation, dissolution
or similar arrangement under any present or future
statute, law, rule or regulation, or file an answer
admitting the material allegations of a
petition filed against it in any such proceeding,
consent to the filing of such a petition or
acquiesce in the appointment of a trustee,
receiver, custodian or other similar official for
it or of all or any substantial part of its assets
or properties, or (7) take any action looking to
its dissolution or liquidation, or if an order for
relief against Tenant or any guarantor of any of
Tenant's obligations hereunder shall have been
entered under any chapter of the Bankruptcy Code,
or a decree or order by a court having jurisdiction
over the demised premises shall have been entered

(17)

approving as properly filed a petition seeking
reorganization, arrangement, readjustment,
liquidation, dissolution or similar relief against
Tenant or any guarantor of Tenant's obligations
hereunder under any present or future statute,
law, rule or regulation, or within thirty (30) days after the
appointment without Tenant's or such
guarantor of all or any substantial part of its or
such guarantor's assets and properties, such
appointment shall not be vacated; or an order,
judgment or decree shall be entered against Tenant
or such guarantor by a court of competent
jurisdiction and shall continue in effect for any
period of ten (10) consecutive days without a stay
of execution, or any execution or writ or process
shall be issued under any action or proceeding
against Tenant whereby any Tenant's property or its
use may be taken or restrained.

Upon the occurrence of an Event of Default hereunder,
Landlord or anyone acting on Landlord's behalf (including but not
limited to Agent), may, at any time thereafter, without notice or
other action by Landlord and in addition to all other available
legal or equitable rights and remedies, elect any one or more of
the following remedies:

(1)  At Landlord's option, the Rent for the entire
unexpired balance of the Term, as well as all other
charges, payments, costs and expenses herein agreed to
by paid by Tenant, or at the option of Landlord any
part thereof, and also all costs and officers'
commissions including watchmen's wages and further
including a sum equal to 5% of the amount of the levy
as commissions to the constable or other person making
the levy, shall, in addition to any and all
installments of Rent already due and payable and in
arrears and/or any other charge, expense or cost herein
reserved, included or agreed to be treated or collected
as rent, and/or any other charge, expense or cost
herein agreed to be paid by Tenant which may be due and
payable and in arrears, be accelerated and taken to be
due and payable and in arrears as if by the terms and
provisions of this Lease, the whole balance or such
part of unpaid Rent and other charges, payments, taxes,
costs and expenses were on that date payable in advance;
and if this Lease or any part thereof is assigned, or if
the demised premises or any part thereof is sublet,
Tenant hereby irrevocably constitutes and appoints
Landlord Tenant's agent to collect the rents due by such
assignee or sublessee and apply the same to the Rent due
hereunder without in any way affecting Tenant's

(18)

obligation to pay any unpaid balance of Rent due hereunder; or

(2)   Landlord may terminate the Term of this Lease in which case this Lease shall determine and become absolutely void without any right on the part of Tenant to save the forfeiture by payment of any sum due or by other performance of any condition, term or covenant broken; and upon such termination Tenant shall quit and surrender the demised premises to Landlord in the condition specified by the provisions of this Lease and Landlord shall be entitled to recover damages for Tenant's breach, in addition to all sums due and in arrears hereunder as of the date of such termination, an amount equal to the amount of Rent reserved for the balance of the Term of this Lease, less the fair rental value of the demised premises, for the balance of the Term.

11.   <u>FURTHER REMEDIES OF LANDLORD:</u>

Upon the occurrence of an Event of Default hereunder, Landlord, or anyone acting on Landlord's behalf (including but not limited to Agent), at Landlord's option may, in addition to any of the remedies provided in paragraph 10 hereof and all other available legal or equitable rights and remedies:

(a)   without notice or demand, reenter the demised premises, breaking open locked doors if necessary to effect entrance, without liability to action for prosecution or damages for such entry or for the manner thereof, for the purpose of levying and for any other purposes, and may take possession of and sell all goods and chattels at auction, on three days' notice served in person on Tenant, or left on the demised premises, and pay out of the proceeds all sums due and in arrears hereunder as of the date of such reentry; and/or

(b)   reenter the demised premises, breaking open locked doors, if necessary, to effect entrance without liability to action for prosecution or damages for such entry or for the manner thereof, and without demand, proceed by distress and sale of the goods there found to levy the Rent and/or other charges herein payable as rent, and all costs and officers' commissions, including watchmen's wages and sums chargeable to Landlord, and further including a sum equal to 5% of the amount of the levy as commissions to the constable or other person making the levy, shall be paid by Tenant, and in such case all costs, officers' commissions and other charges shall immediately attach and become part of the claim of Landlord for Rent, and any tender of Rent without said

costs, commissions and charges made after the issue of a warrant of distress shall not be sufficient to satisfy the claim of Landlord hereunder; and/or

(c)  (but shall be under no obligation to), in its own name as agent for Tenant if the Term has not been terminated or in its own behalf if the Term of this Lease has been terminated, relet all or any part of the demised premises for the account of Tenant for such term or terms (which may be greater or less than the period which would otherwise have constituted the balance of the Term) and on such conditions and provisions (which may include concessions or free rent) as Landlord, in its reasonable discretion, may determine, and Landlord may collect and receive any rents payable by reason of such reletting. Landlord shall not be required to (1) accept any tenant offered by Tenant or (2) observe any instruction given by Tenant about such reletting. For the purpose of such reletting, Landlord may decorate or make repairs, changes, alterations or additions shall be charged to and be payable by Tenant as Additional Rent hereunder, as will any reasonable brokerage and legal fees expended by Landlord in connection with such reletting. No reletting shall be deemed to be a surrender and acceptance of the demised premises.

12.  **EJECTMENT:**

When the Term of this Lease shall be terminated on account of any Event of Default hereunder and also when the Term of this Lease is terminated during any renewal or extension of the Term, and also when and as soon as the Term hereby created or any extension thereof shall have expired, it shall be lawful for any attorney of any court of record to appear as attorney for Tenant and all persons claiming by, through or under Tenant, to file an agreement for entering in any competent court an amicable action in ejectment against Tenant and all persons claiming by, through or under Tenant and to therein confess judgment for the recovery by Landlord of possession of the demised premises, for which this Lease shall be sufficient warrant; thereupon, if Landlord so desires, an appropriate writ of possession may issue forthwith, without any prior writ or proceedings whatsoever; and provided that if for any reason after such action shall have been commenced it shall be determined that possession of the demised premises should remain in or be restored to Tenant, Landlord shall have the right upon any subsequent default or defaults, or upon the termination of this Lease or the Term as hereinbefore set forth, to bring one or more amicable action or actions as hereinbefore set forth to recover possession of the demised premises.

13.   **AFFIDAVIT OF DEFAULT:**

In any amicable action of ejectment and/or for Rent in arrears, Landlord shall first cause to be filed in such action an affidavit made by Landlord or someone acting for Landlord setting forth the facts necessary to authorize the entry of judgment, of which facts such affidavit shall be conclusive evidence, and if a true copy of this Lease (and of the truth of the copy such affidavit shall be sufficient evidence) be filed in such suit, action or actions, it shall not be necessary to file the original as a warrant of attorney, any rule of court, custom or practice to the contrary notwithstanding.

14.   **ATTORNEY'S FEES:**

If there shall be an Event of Default by Tenant hereunder, and if Landlord shall shall institute an action or summary proceeding against the Tenant based upon such Event of Default, or if Landlord shall pursue any of the remedies available to it in the event of same, or if the Landlord shall cure such Event of Default for the account of Tenant, then Tenant shall reimburse Landlord, as Additional Rent, for all attorneys' fees and disbursements thereby incurred by the Landlord.

15.   **REMEDIES CUMULATIVE:**

All of the remedies available to Landlord hereunder and all rights and remedies given to it by law and equity shall be cumulative and concurrent.  No termination of the Term of this Lease or the taking or recovering of the demised premises shall deprive Landlord of any of its remedies or actions against Tenant or Rent and sums due at the time or which, under the provisions hereof, would in the future become due as if there had been no termination; nor shall the bringing of any action for Rent or breach of any provision hereunder, nor the resort to any other remedy herein provided for the recovery of Rent be construed as a waiver of the right to obtain possession of the demised premises. All rights and remedies of Landlord shall be applicable to and available against any and all permitted assignees and subtenants of Tenant.

16.   **BROKERAGE/LEASING:**

The parties acknowledge that there is no broker involved in this transaction and no broker's fee is due.

17.   **SECURITY DEPOSIT:**

Tenant does herewith deposit with Agent the sum of TWELVE THOUSAND FIVE HUNDRED AND 00/XX ($12,500.00) DOLLARS, to be held as security for the full and faithful performance by Tenant of Tenant's obligations under this Lease and for the payment of repairs necessary to fix damages to the demised premises.  The security deposit is to be held by Landlord in a NON-INTEREST

BEARING ACCOUNT as an escrow fund pursuant to the terms and provisions of applicable law.  Except for such sum as shall be lawfully applied by Agent to satisfy valid claims against Tenant arising from Events' of Default under this Lease or by reason of damages to the demised premises, the security deposit shall be returned to Tenant at the expiration of the Term of this Lease or any renewal or extensions thereof.  It is understood that no part of any security deposit is to be considered as the last monthly installment of minimum rental due under this Lease.  If at any time Tenant shall be in default under any of the provisions of the Lease, Agent shall be entitled at its sole discretion (1) to apply the security deposit or any part thereof to payment of (A) any Annual Fixed Rent, Additional Rent and/or additional charges then past due, (B) any expense incurred by Landlord or Agent in curing any default by Tenant hereunder, and/or (C) any other sums due to Landlord in connection with such default or the curing thereof, including, without limitation, any damages and expenses (including attorneys; fees) incurred by Landlord or Agent by reason of such default; or (2) to retain the same in liquidation of all or part of the damages suffered by Landlord by reason of such default.  If any portion of the security deposit is so used or applied, Tenant shall, within five (5) days after written demand therefor, deposit cash with Agent in an amount sufficient to restore the security deposit to its original amount on the date of this Lease.

18.  <u>SUBORDINATION:</u>

This Lease Is and shall be subject and subordinate at all times to the lien of any mortgages and/or ground rents and/or other encumbrances, including but not limited to declarations of covenants and restrictions and other similar recorded instruments, now or hereafter placed on the building of which the demised premises are a part, or its related land, and to all renewals, modifications, amendments, consolidations, replacements and extensions thereof (all of which are hereinafter referred to as a "mortgage"), and such subordination shall be automatic and without the necessity of any further instrument or act on the part of Tenant to effectuate such subordination.  Tenant shall, at the request of any holder of any mortgage, attorn to such holder. Tenant covenants and agrees to execute and deliver upon demand of Landlord or the holder of any mortgage such further instrument or instruments evidencing such subordination of Tenant's right, title and interest under this Lease to the lien of any such mortgage and such further instrument or instruments of attornment as shall be desired by the holder of any mortgage.  Tenant hereby irrevocably appoints Landlord as attorney in fact for Tenant, with full power and authority to execute and deliver any such instrument or instruments for and in the name of Tenant.

19.  <u>ZONING & PERMITS:</u>

Anything herein contained to the contrary notwithstanding, this Lease and all of the terms, covenants, conditions and other provisions hereof are in all respects subject and subordinate to

(22)

all zoning restrictions affecting the demised premises and the building in which they are located and its related land, and Tenant agrees to be bound by such restrictions. Further, Landlord does not warrant that any license or licenses, permit or permits or any other governmental approval which may be required for the business to be carried on by Tenant in the demised premises will be granted, or if granted will be continued in effect or renewed, and any failure to obtain such license or licenses, permit or permits, or any other governmental approval or any revocation thereof, or failure to renew the same, shall not release Tenant from the terms covenants, conditions and other provisions of this Lease. Nothing in this Lease contained shall obligate Landlord to assist Tenant in obtaining any such permit or license or approval.

20. <u>CONDITION OF PREMISES:</u>

Tenant hereby represents that Tenant has examined the demised premises and that they are in good and tenantable condition, and agrees that Tenant's entering into possession of the demised premises shall be an acknowledgment by Tenant that the demised premises were in good and tenantable condition at the beginning of the Term hereof, latent defects excepted. Tenant acknowledges that Landlord has let and that Tenant accepts the demised premises in their present "AS-IS" condition and that neither Landlord, Agent nor their respective officers, employees, servants, representatives or attorneys have made any representations or promises, whether express or implied, concerning the condition of the demised premises. It is understood and agreed that Landlord is under no duty to make repairs or alterations or improvementsor if necessitated by any act, omission, or negligence of Landlord, its employees, aagents, contractor, or invitees, to the demised premises at the time of letting or at any time during the Term, unless specifically set forth elsewhere herein, or if necessitated by any act, omission, or negligence of Landlord, its employees, agetns, contractors or invitees. No contract entered into or that may be subsequently entered into by Landlord relative to any alterations, additions or improvements, nor the failure of Landlord to make such alterations, additions or improvements as required by any such contract, nor the making of such alterations, additions or improvements by Landlord, Agent or any of their agents or contractors, shall in any way affect the payment of the Rent at the times specified in this Lease.

21. <u>LAWFUL USE OF PREMISES:</u>

The violation by Tenant of any state, federal or local laws or municipal ordinances or regulations shall give Landlord the right to immediately terminate the Term of this Lease and to re-enter and take possession of the demised premises. In addition, information filed with Landlord by any constituted authority to the effect that the demised premises are being used in violation of any laws or ordinances or regulations applicable to the demised premises or Tenant's use or occupancy of same shall be sufficient evidence to give Landlord the right to terminate the Term of this

Lease with no liability upon Landlord for any untrue statements or mistake of fact contained therein.

22. <u>WAIVER OF CUSTOM:</u>

It is hereby agreed that any law, usage, custom or conduct to the contrary notwithstanding, including conduct or custom on the part of Landlord in refraining from enforcing its rights and remedies hereunder, Landlord shall have the right at all times to enforce the provisions of this Lease to strict accordance with the provisions hereof; and it is further agreed that the failure of Landlord at any time or times to enforce its rights hereunder strictly in accordance with the provisions hereof shall not be construed as having created a custom in any way or manner contrary to the specific provisions of this Lease or as having in any way or manner modified the same, and the receipt of any Rent by Landlord from Tenant or any non-permitted assignee, subtenant of Tenant, whether the same be Rent that originally was reserved or that which may become payable under anyprovision herein contained, or of any portion thereof, shall not operate as a waiver of the right of Landlord to enforce the payment of Rent or of any of the other provisions of this Lease by such remedies as may be appropriate, and shall not waive or void the right Landlord at any time thereafter, to elect to terminate the Term of this Lease, on account of such non-permitted assignment, subletting, transferring of this Lease or any other breach of any provision of this Lease.

23. <u>HEATING AND AIR CONDITIONING MAINTENANCE:</u>

Notwithstanding anything to the contrary contained in this Lease, if there is a heating, ventilating, air conditioning system and/or domestic hot water boiler, but only to the extent such servics the demised premises (HVAC System), Tenant shall, at its sole cost and expense, maintain the HVAC System in good order and repair, repairing such parts capable of being repaired, and replacing, from time to time, all broken, worn and torn parts incapable of being repaired.  Tenant shall, at its sole cost and expense, obtain an extended service and maintenance contract to provide routine and preventive maintenance to the HVAC System during the Term and any renewal or extension thereof, but only to the extent such services the demised premises.  Such maintenance contract shall be with a reputable company, and Tenant shall deliver to Landlord evidence of such contract.

24. <u>TERMINATION OF LANDLORD'S LIABILITY:</u>

If the interest or estate of Landlord in the demised premises shall terminate by operation of law or a bona fide sale or other transfer of the demised premises or the building of which the demised premises are a part or of the building's related land, or by execution or foreclosure sale or for any other reason, or if for any reason Landlord ceases to be entitled to the Rent hereunder, then in any such event Landlord and Agent and their respective officers, employees, servants and agents, shall be

( 24 )

released and relieved from all liability, obligation and responsibility thereafter accruing in connection with any of the terms, covenants, conditions or other provisions hereunder to be performed by or herein imposed upon Landlord or Agent and Tenant shall look solely to Landlord's successor in interest for the performance of the obligations of Landlord hereunder which may accrue thereafter.

25.  **NOTICES:**

All notices or other communications required to be given by Landlord to Tenant hereunder shall be in writing and shall be sufficiently given by leaving the same upon the demised premises. All notices or other communications required to be given by Tenant to Landlord hereunder shall be in writing and shall be given to Agent by registered mail or certified mail, return receipt requested, postage prepaid and addressed to Agent at the address of Agent set forth at the beginning of this Lease or to such other person or at such other address as Landlord or Agent may specify by notice to Tenant.  As against Landlord the only admissible evidence that notice has been given by Tenant shall be a registry return receipt signed by Agent or Landlord.

26.  **LEASE CONTAINS ALL AGREEMENTS:**

This Lease and the riders and exhibits hereto, if any, contains the entire agreement between the parties hereto relating to the subject matter contained herein, and shall not be amended, modified or supplemental unless by agreement in writing signed by both Landlord and Tenant.  Neither party hereto has made any agreements, representations or promises to the other, either oral or written, except as expressly contained herein.  This Lease supersedes all prior negotiations, agreements, informational brochures, letters, promotional information and other statements and materials made or furnished by Landlord or its agents.

27.  **HEIRS AND ASSIGNEES:**

The provisions of this Lease and all rights and liabilities herein given to, or imposed upon, the respective parties hereto shall extend to and bind the several and respective heirs, executors, administrators, personal representatives, successors and permitted assigns of said parties; and if there shall be more than one Tenant, they shall all be bound jointly and severally by the terms, provisions, covenants and agreements herein, and the word "Tenant" shall be deemed and taken to mean each and every person or party mentioned as a Tenant herein, be the same one or more; and if there shall be more than one Tenant, any notice required or permitted by the terms of this Lease may be given by or to any one thereof, and any notice so given shall have the same force and effect as if given by or to all persons and parties constituting the Tenant hereunder.  Notwithstanding the foregoing, no rights hereunder shall inure to the benefit of any assignee of Tenant unless the assignment to such assignee has been approved by

(25)

Landlord in writing as aforesaid.

28.  HEADINGS NOT PART OF LEASE:

Any headings preceding the text of the several paragraphs and sub-paragraphs hereof are inserted solely for convenience of reference and shall not constitute a part of this Lease and shall not in any way be utilized to construe or interpret the agreement of the parties set forth herein.

29.  SEVERABILITY:

If any of the provisions of this Lease or the application thereof to any person or circumstances, shall, to any extent, be invalid illegal or otherwise unenforceable, the remainder of this Lease, and the application of such provision(s) to any person or circumstances other than those as to whom or which it has been held invalid, illegal or unenforceable, shall not be affected thereby, and every provision in this Lease shall be valid and enforceable to the fullest extent permitted by law.

30.  NO RESERVATION OR OPTION:

The submission of this Lease by Landlord, its attorneys or agents, for examination or execution by Tenant, does not constitute a reservation of (or option for) the demised premises in favor of Tenant and Tenant shall have no right or interest in the demised premises and Landlord shall have no liability hereunder, unless and until this Lease is executed and delivered by Landlord.  No rights, easements or licenses are acquired in the land upon which the demised premises are located or in any land adjacent thereto, by Tenant by implication or otherwise, except as expressly set forth in this Lease.

31.  MECHANICS' LIENS:

(a)  No liens:  Tenant shall not create or permit to be created or remain, any lien, encumbrance or charge (whether levied on account of any tax or other imposition or any mechanic's laborer's or materialmen's lien or otherwise) which might be or which may become a lien, encumbrance or charge upon the demised premises or the building of which the demised premises are a part of its related land, or any part thereof, or upon the income therefrom, having any priority or preference over or ranking on a parity with the estate, rights and interest of Landlord in the demised premises, building or land, or any part thereof or the income therefrom, and Tenant shall not suffer any other matter or thing whereby the estate, rights and interest of Landlord in the demised premises, building or land, or any part thereof might be impaired; provided that any mechanic's, laborer's or materialmen's lien may be discharged in accordance with subparagraph (b) of this paragraph.

(b) <u>Discharge of liens</u>:  If any mechanic's, laborer's or materialman's lien shall at any time be filed against the demised premises, building or land, or any part thereof, Tenant shall, within fifteen (15) days after notice of the filing thereof cause it to be discharged of record by payment, deposit, bond, order of a court of competent jurisdiction or otherwise.  If Tenant fails to cause such lien to be discharged within the period aforesaid, then in addition to any other right or remedy, Landlord may, but shall not be obligated to, discharge it either by paying the amount claimed to be due or by procuring the discharge of such lien by deposit or by bonding proceedings, and in any such event, Landlord shall be entitled, if Landlord so elects, to compel the prosecution of any action for the foreclosure of such lien by the lienor and to pay the amount of the judgment in favor of the lienor with interest, costs and allowances.  Any amount so paid by Landlord and all costs and expenses incurred by Landlord in connection therewith, together with interest thereon, at a rate of interest equal to three percent (3%) per annum over the prime interest rate charged from time to time by (1) Mellon Bank in Philadelphia, Pennsylvania, or, at Landlord's option, (2) the largest commercial bank whose principal office is in Philadelphia, Pennsylvania, from the respective dates of Landlord's making of the payments and incurring of the costs and expenses, shall constitute Additional Rent payable by Tenant under this Lease and shall be paid by Tenant to Landlord on demand.

(c) <u>Waiver of liens</u>:  Notwithstanding anything to the contrary set forth in this paragraph, prior to the making of any alterations, additions or improvements to the demised premises, Tenant shall, in addition to obtaining Landlord's written consent in accordance with the provisions of this Lease, cause to be filed in the Office of the Prothonotary of the County in which the demised premises are located, a Waiver of Mechanics' and Materialmen's liens to be binding on all subcontractors and materialmen in form satisfactory to Landlord's counsel.

(d) <u>No consent of landlord intended</u>:  Nothing contained in this Lease shall be deemed or construed in any way as constituting the consent or request of Landlord, express or implied by inference or otherwise, to any contractor, subcontractor, laborer of materailman for the performance of any labor or the furnishing of any materials for any specific alteration, addition, improvement or repair to the demised premises or any part thereof, or as giving Tenant any right, power or authority to contract for, or permit the rendering of, any services or the furnishing of any materials that would give rise to the filing of any lien against the demised premises or any part thereof.

32.  <u>NO RECORDING:</u>

This Lease shall not be recorded in whole or in memorandum form or otherwise be filed or made a matter of public record by either party without the prior written consent of the other.

33.   <u>TIME OF ESSENCE:</u>

Time, wherever specified herein for satisfaction of
conditions or performance of obligations by Tenant, is of the
essence of this Lease.

34.   <u>AUTHORITY:</u>

Each party warrants that it has full power, authority and
legal right to execute and deliver this Lease, and to perform keep
and observe all of the provisions of this Lease on such party's
part to be performed, kept and observed.  Each party warrants that
this Lease is its valid and enforceable obligation.

35.   <u>GOVERNING LAW:</u>

This Lease and all issues arising hereunder shall be governed
by and construed in accordance with the laws of the Commonwealth
of Pennsylvania.

36.   <u>BROKERAGE:</u>

Tenant represents and warrants that it has not dealt with any
broker, agent, finder or other person in connection with the
negotiation for or the obtaining of this Lease or the demised
premises, and that no broker, agent, finder or other person
brought about the transaction contemplated by this Lease, other
than Agent, or a cooperating broker identified in a written notice
from Tenant to Landlord, and Tenant agrees to indemnify and hold
Landlord harmless from and against any and all claims, costs
(including attorneys' fees) and liability for commissions or other
compensation claim by any other broker, agent, finder or other
person claiming a commission or other form of compensation by
virtue of having been employed or engaged by Tenant or having
dealt with Tenant with regard to this Lease.  The provisions of
this Paragraph shall survive the termination of this Lease.

37.   <u>EXHIBITS AND RIDERS:</u>

All exhibits referred to in this Lease and all riders hereto
are attached hereto, incorporated herein and shall be deemed an
intergal part hereof.

38.   <u>OPPORTUNITY TO CONSULT ATTORNEY:</u>

Tenant acknowledges that this Lease is a legally binding
contract with important legal consequences and that Tenant
accordingly has either (1) consulted with tis attorney concerning
this Lease and the provisions contained herein, (2) had its
attorney negotiate the provisions of this Lease with landlord
and/or any of their respective attorneys, or (3) been given the
time and opportunity to consult with its attorney concerning this
Lease and has knowingly and freely decided not to so consult with

(28)

its attorney.

39.  OPTION TO RENEW LEASE:

So long as Tenant was or is not in default of any provision of this lease, Tenant shall have the option to renew this Lease, at the expiration of the original term and upon NINETY (90) DAYS prior written notice, for a term of NINE (9) YEARS commencing SEPTEMBER 1, 2018 and terminating AUGUST 31, 2027.  All terms and condition shall remain in full force and effect except that the minimum term rental shall be ONE MILLION TWO HUNDRED SEVENTY-FIVE THOUSAND AND 00/XX ($1,275,000.00) DOLLARS, to be paid in advance in equal monthly installments as follows:

      9/1/18 to 8/31/23: $135,000.00/year ($11,250.00/mth)
      9/1/23 to 8/31/27: $150,000.00/year ($12,500.00/mth)

40.  LANDLORD'S OFFICE:

The parties agree that the excluded areas of the Demised Premises, as set forth in the Introduction of this Lease, shall be reserved for the use by Landlord during the term of this Lease, or any renewals thereof, and Landlord shall have full access at all times to said areas.


IN WITNESS WHEREOF, the parties hereto, intending to be legally bound hereby, have caused this Lease to be executed by their duly authorized representatives this 13TH day of AUGUST, 1998.


WITNESS:


_____          By:_____(SEAL)
                                      CONSTANTINE SOTOLIDIS,
                                      Landlord


_____          By:_____(SEAL)
                                      ISAAK V. SOTOLIDIS, Landlord

By: _Irene Sotolidis_ (SEAL)
ĪRENE SOTOLIDIS, Landlord

ATTEST:

CCC BALA CYNWYD CINEMA CORP.
Tenant

_____
Sect.

BY: _____ (SEAL)
President

LEASE AGREEMENT PREPARED BY:        HARRY J. KARAPALIDES, ESQ.
                                    Attorney For Landlords
                                    42 Copley Road
                                    Upper Darby, PA 19082
                                    610-352-1200
                                    610-352-2929
                                    610-352-5980 (Fax)

(30)

233  P02       AUG 18'98 13:2

# EXHIBIT "A"

**Demised premises are part and parcel of the following premises.**

## LEGAL DESCRIPTION

ALL THAT CERTAIN lot or piece of ground with buildings and improvements thereon erected situate in the Township of Lower Merion, County of Montgomery, State of Pennsylvania, bounded and described according to a survey for Arthur Batoff, dated June 20, 1983 prepared by Yerkes Associates, Inc., Consulting Engineers and Surveyors as follows to wit:

BEGINNING at a point in the bed of Bala Avenue (50 feet wide) said point being distant 35.09 feet from a monument found and held with the curb line of the aforesaid Bala Avenue.

THENCE (1) North 24 degrees 14 minutes West along the old title line 50.18 feet to a point for a corner; said point being in the bed of Bala Avenue;

THENCE (2) North 12 degrees 46 minutes East still along the old title line in the bed of Bala Avenue 150.78 feet to a point for a corner; said point being corner of lands, now or formerly of Edward Mathis;

THENCE (3) South 78 degrees 29 minutes East along lands of said Mathis 72.53 feet to a point for a corner;

THENCE (4) North 64 degrees 23 minutes 30 seconds East along same 10.19 feet to a point for a corner;

THENCE (5) North 11 degrees 31 minutes East along same 92.64 feet in a point for a corner; said point being a corner to lands now or formerly of Alan J. Kirsch and the Montgomery County Industrial Development Authority;

THENCE (6) South 49 degrees 23 minutes East along same 118.59 feet to a point for a corner;

THENCE (7) Southeastwardly along the same, and along the arc of a circle curving to the left with a radius of 395.00 feet the arc distance of 38.08 feet to an iron pin found and held;

THENCE (8) South 39 degrees 19 minutes West still along same 4.21 feet to a point for a corner;

THENCE (9) South 49 degrees 27 minutes 24 seconds East along same 59.50 feet to a point for a corner; said point being corner to lands now or formerly of Kirsch Enterprises, Inc.;

233 P03        AUG 18'98 13:27

**THENCE** (10) South 64 degrees 29 minutes West along lands of the aforesaid Kirsch Enterprise, Inc., and lands of Albert Ammon and Lands of Joseph Andrelli and lands of T.L. Kone, Inc., and lands of Robert J. Gillin, and lands of M. Zylberdrut and crossing a monument found and held with the curb line of Bala Avenue 303.86 feet to the point and place of beginning.

## ASSIGNMENT AND ASSUMPTION OF LEASE

THIS ASSIGNMENT AND ASSUMPTION OF LEASE (the "Assignment"), dated as of April 30, 2013, by and among CCG HOLDINGS, LLC, a Delaware limited liability company, having an address of 1111 Stewart Avenue, Bethpage, NY 11714 ("Assignor"), BTC HOLDINGS 432, LLC, a Delaware limited liability company, having an address of c/o Bow Tie Cinemas, LLC, 641 Danbury Road, Ridgefield, CT 06877 ("Assignee"), and CONSTANTINE SOTOLIDIS, ISAAK SOTOLIDIS & IRENE SOTOLIDIS, having an address of 157 Bala Avenue, Bala Cynwyd, PA 19008 (collectively, "Landlord"), recites and provides as follows:

### RECITALS

A.     Assignor is the current tenant under that certain lease agreement with Landlord dated August 13, 1998, as may be amended (the "Lease"), for the following real property: 157 BALA AVENUE, FIRST FLOOR, SECOND FLOOR PROJECTION ROOM, BATHROOM AND TWO STOCK ROOMS, THIRD FLOOR OLD PROJECTION BOOTH, AND BASEMENT (EXCLUDING SECOND FLOOR OFFICE OVER FRONT BOX OFFICE AND THIRD FLOOR TWO CLOSETS), TOWNSHIP OF BALA CYNWYD, MONTGOMERY COUNTY, COMMONWEALTH OF PENNSYLVANIA, as more particularly described in the Lease (the "Premises");

B.     Pursuant to that certain Asset Purchase Agreement, dated as of April 29, 2013, (the "Purchase Agreement"), Assignor has agreed to sell certain assets to Assignee, and Assignee has agreed to acquire such assets and assume certain related liabilities;

C.     Assignor has agreed to assign to Assignee, and Assignee has agreed to assume, all of Assignor's right, title and interest in and to the Lease effective as of the later of (1) the Closing Date (as defined in the Purchase Agreement) or (ii) the date of the execution by Landlord of the Assignment (the "Effective Date") upon the terms and conditions hereinafter set forth; and

D.     Landlord has agreed to consent to the assignment of the Lease from Assignor to Assignee under the terms hereof.

### ASSIGNMENT

NOW, THEREFORE, for and in consideration of the foregoing, the mutual covenants herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.     **Assignment.** As of the Effective Date, Assignor transfers, conveys, assigns and sets over to Assignee all of Assignor's right, title and interest in, to and under the Lease and the Premises.

2.     **Acceptance and Assumption.** As of the Effective Date, Assignee accepts the assignment to it of Assignor's right, title and interest in, to and under the Lease and assumes and agrees to be bound by the Lease and to keep, perform and fulfill each and all of the covenants, agreements, provisions, terms, conditions and obligations required to be kept, performed and fulfilled by Assignor under the Lease which arise and relate to periods on or subsequent to the Effective Date.

3.     **Landlord's Consent.** Landlord hereby consents to the assignment of the Lease by

N-219859_2

# EXHIBIT "B"

Assignor to Assignee. This Assignment shall not be deemed to release Assignor from any liabilities or obligations for liabilities and claims (including, without limitation, claims for labor and materials asserted to have been furnished to Assignor or claims for personal injury or damages to property) incurred by or made against Landlord and/or Assignor to the extent connected with, relating to, or arising out of the use or occupancy of the Premises by Assignor or anyone claiming by, through or under Assignor, up to and including the Effective Date. Assignor does hereby remise and forever releases and discharges Landlord from all manner of action and actions, causes of actions, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, controversies, damages, judgments, executions, claims and demands whatsoever for Assignor and Assignee, in law or in equity, which Assignor has or may have against Landlord arising out of the Lease prior to the Effective Date; provided, however, that the foregoing remise, release and discharge shall not apply (i) to any additional rent or other charges paid by Assignor under the Lease on or prior to the Effective Date and which, pursuant to the Lease, are subject to reconciliation after the Effective Date or (ii) to any obligation of Landlord under the Lease to reimburse Assignor for any overpayment of such amounts.

4.      **Security Deposit.** Landlord is holding a security deposit under the Lease in the sum of TWELVE THOUSAND FIVE HUNDRED AND 00/100 DOLLARS ($12,500.00). Assignor does hereby assign all of its right, title and interest in said security deposit to Assignee and the same shall be held by Landlord on behalf of Assignee and shall be returned to Assignee at the expiration or sooner termination of the Lease, subject to the terms and conditions of the Lease.

5.      **Effective Date.** In the event the Effective Date does not occur prior to August 31, 2013, this Assignment shall be null and void and of no further force and effect

6.      **Entire Agreement.** This Assignment and the Purchase Agreement constitute the entire agreement between the parties hereto with respect to the matters contemplated herein and supersedes all prior discussions, undertakings, agreements and negotiations between the parties hereto.   This Assignment may be modified by written instrument duly executed by the parties hereto.

7.      **Governing Law.** This Assignment shall be governed by and construed in accordance with the laws of the state in which the Premises are located.

8.      **Binding Effect.** This Assignment shall be binding upon, and the benefits hereof shall inure to, the parties hereto and their respective successors and assigns.

9.      **Counterpart Signatures.**  This Assignment may be executed in any number of counterparts, each of which shall be an original and all of which together shall constitute but one and the same instrument.

10.     **Invalidity.** If any term, covenant or condition of this Assignment or the Lease or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, then the remainder of this Assignment and the Lease (as applicable), or application of such term, covenant or condition to persons or circumstances other than those to which the same is held invalid or unenforceable, shall not be affected thereby and each term, covenant and condition of this Assignment and the Lease shall be valid and enforced to the fullest extent permitted by law.

11.     **Reaffirmation.** All terms, conditions, covenants and provisions of the Lease not inconsistent with or modified by this Assignment shall remain in full force and effect and shall survive the execution of this Assignment and the parties do hereby ratify all terms and conditions of the Lease, subject to this Assignment. In amplification (and not in limitation) of the foregoing, Assignee agrees that

N-219859_2                                           2

Section 12 of the Lease shall remain in full force and effect from and after the Effective Date and, in furtherance thereof, Section 12 of the Lease is hereby restated in its entirety as follows (in order to confirm that same shall be binding upon Assignee from and after the Effective Date):

"12.   EJECTMENT:

When the Term of this Lease shall be terminated on account of any Event of Default hereunder and also when the Term of this Lease is terminated during any renewal or extension of the Term, and also when and as soon as the Term hereby created or any extension thereof shall have expired, it shall be lawful for any attorney of any court of record to appear as attorney for Tenant and all persons claiming by, through or under Tenant, to file an agreement for entering in any competent court an amicable action in ejectment against Tenant and all persons claiming by, through or under Tenant and to therein confess judgment for the recovery by Landlord of possession of the demised premises, for which this Lease shall be sufficient warrant; thereupon, if Landlord so desires, an appropriate writ of possession may issue forthwith, without any prior writ or proceedings whatsoever; and provided that if for any reason after such action shall have been commenced it shall be determined that possession of the demised premises should remain in or be restored to Tenant, Landlord shall have the right upon any subsequent default or defaults, or upon the termination of this Lease or the Term as hereinbefore set forth, to bring one or more amicable action or actions as hereinbefore set forth to recover possession of the demised premises."

Assignee's initials

12.   **Confirmation of Lease Term, Renewal and Rents:** The parties hereto do hereby confirm the primary/original term of the Lease, the renewal term (if Tenant exercises its option to renew the Lease as provided in Paragraph 39 of the Lease) and the minimum term rental payable under the Lease, as follows:

| | |
|---|---|
| Primary/Original Term: | 8/13/98 to 8/31/18 |
| Remaining Years and Rate of Minimum Term Rental: | 5/1/13 to 8/31/13 - $8,750.00 per month<br>9/1/13 to 8/31/18 - $10,000.00 per month |
| Renewal Term (if Tenant exercises its option to renew the Lease as provided in Paragraph 39 of the Lease): | 9/1/18 to 8/31/27 |
| Years and Rate of Minimum Term Rental: | 9/1/18 to 8/31/23 - $11,250.00 per month<br>9/1/23 to 8/31/27 - $12,500.00 per month |

13.   **Consideration Amount.** Assignor, within seven (7) business days after the date on which it receives from Landlord an original counterpart of this Assignment executed by Landlord, shall pay to Landlord, by check made payable to the unendorsed order of Landlord, the amount of $15,000.00 (the "Consideration Amount"), $1,500.00 of which constitutes reimbursement of Landlord's legal fees incurred in connection with this Assignment, $3,500.00 of which constitutes reimbursement to Landlord for the removal of movie theater chairs located in the loft/room above the middle theater, and $10,000.00 of which constitutes the payment of the balance of the holdback escrow due in connection with that certain Asset Purchase Agreement, dated as of July 23, 1998, between Constantine Sotolidis and CCC Bala Cynwyd Cinema Corp. If the whole or any portion of the Consideration Amount is not paid timely

by Assignor, then Landlord's consent to the assignment of the Lease by Assignor to Assignee shall be deemed null and void.

[SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF**, this Assignment has been executed and delivered on the date first above written.

**ASSIGNOR:**

CCG HOLDINGS, LLC,
a Delaware limited liability company

Witness:

By: _____
Name: _Douglas R. Ozmun_
Title: _SVP / General Manager_

**ASSIGNEE:**

BTC HOLDINGS 432, LLC,
a Delaware limited liability company

Witness:

By: 1530 Management, LLC, Manager

By: _____
Charles B. Moss III, Manager

**LANDLORD:**

Witness:

_____
Constantine Sotolidis

_____
Isaak Sotolidis

_Irene Sotolidis_
Irene Sotolidis

N-219859_2

IN WITNESS WHEREOF, this Assignment has been executed and delivered on the date first above written.

ASSIGNOR:

Witness:

CCG HOLDINGS, LLC,
a Delaware limited liability company

By: _____
Name: _Douglas R. Cronk_
Title: _SVP/ General Manager_

ASSIGNEE:

Witness:

BTC HOLDINGS 432, LLC,
a Delaware limited liability company

By: 1530 Management, LLC, Manager

By: _____
    Charles B. Moss III, Manager

LANDLORD:

Witness:

_____
Constantine Sotolidis

_____
Isonk Sotolidis

_Irene Sotolides_
Irene Sotolidis

N-219859_2

# Exhibit "B"

2
3
4
5
6
7
8
9
10
11

COPY

Asset Purchase Agreement

Dated as of July 23, 1998

Between

Constantine Sotolidis

and

CCC Bala Cynwyd Cinema Corp.

P1-152779.02

ARTICLE I. DEFINITIONS; CONSTRUCTION .................................................................... 1

    1.1. Definitions ......................................................................................................... 1
    1.2. Construction ...................................................................................................... 5

ARTICLE II. THE TRANSACTION ........................................................................................ 5

    2.1. Sale and Purchase of Assets ............................................................................. 5
    2.2. Cash; Etc. ........................................................................................................... 5
    2.3. Retained Assets ................................................................................................. 6
    2.4. Retained Liabilities ........................................................................................... 6
    2.5. Purchase Price ................................................................................................... 6
    2.6. Escrow Agent .................................................................................................... 6
    2.7. Closing ............................................................................................................... 6
    2.8. Payment of Purchase Price ............................................................................... 7
    2.9. Allocation of Purchase Price ............................................................................ 7
    2.10. Title ................................................................................................................... 7
    2.11. Certain Consents ............................................................................................... 7

ARTICLE III. REPRESENTATIONS AND WARRANTIES OF SELLER ............................ 7

    3.1. Organization ...................................................................................................... 8
    3.2. Authorization; Enforceability ........................................................................... 8
    3.3. No Violation of Laws or Agreements; Consents .............................................. 8
    3.4. Cinema Income Statements and Financials ...................................................... 8
    3.5. No Changes ....................................................................................................... 9
    3.6. Taxes ................................................................................................................. 9
    3.7. Undisclosed Liabilities ..................................................................................... 9
    3.8. Condition of Assets; Title; Business ................................................................. 9
    3.9. No Pending Litigation or Proceedings ............................................................. 10
    3.10. Contracts; Compliance ...................................................................................... 10
    3.11. Permits; Compliance with Law ........................................................................ 10
    3.12. Leased Real Estate ............................................................................................ 10
    3.13. Labor Relations ................................................................................................. 11
    3.14. Insurance ........................................................................................................... 11
    3.15. Intellectual Property Rights .............................................................................. 11
    3.16. Employee Benefits ............................................................................................ 11
    3.17. Environmental Matters ...................................................................................... 11
    3.18. Additional Theaters ........................................................................................... 12
    3.19. Finders' Fees ..................................................................................................... 12

ARTICLE IV. REPRESENTATIONS AND WARRANTIES OF BUYER ............................ 12

    4.1. Organization ...................................................................................................... 12
    4.2. Authorization and Enforceability ..................................................................... 13
    4.3. No Violation of Laws; Consents ....................................................................... 13
    4.4. No Pending Litigation or Proceedings ............................................................. 13

4.5. Finders' Fees................................................................................13

ARTICLE V. CERTAIN COVENANTS ...................................................13

5.1. Conduct of Business Pending Closing.............................................13
5.2. Fulfillment of Agreements...........................................................14
5.3. Employment, Severance and Termination Payments.............................14
5.4. Seller's Employees....................................................................15
5.5. Workers' Compensation and Disability Claims...................................15
5.6. Covenant Not to Compete............................................................15
5.7. Publicity...............................................................................16
5.8. Transitional Matters..................................................................16
5.9. Books and Records....................................................................16
5.10. Permits................................................................................16
5.11. Right of First Refusal...............................................................16

ARTICLE VI. CONDITIONS TO CLOSING; TERMINATION ..........................17

6.1. Conditions Precedent to Obligation of Buyer....................................17
6.2. Conditions Precedent to Obligation of Seller....................................18
6.3. Deliveries and Proceedings at Closing.............................................19
6.4. Termination............................................................................20

ARTICLE VII. SURVIVAL OF REPRESENTATIONS; INDEMNIFICATION.....................21

7.1. Survival of Representations.........................................................21
7.2. Indemnification by Seller...........................................................21
7.3. Indemnification by Buyer...........................................................21
7.4. Waiver of Statute of Limitations...................................................22
7.5. Notice of Claims......................................................................22
7.6. Third Party Claims...................................................................22
7.7. Payment................................................................................22

ARTICLE VIII. MISCELLANEOUS ........................................................22

8.1. Costs and Expenses...................................................................22
8.2. Proration of Expenses................................................................23
8.3. Bulk Sales.............................................................................23
8.4. Further Assurances...................................................................23
8.5. Notices.................................................................................23
8.6. Currency...............................................................................23
8.7. Offset; Assignment; Governing Law...............................................24
8.8. Amendment and Waiver; Cumulative Effect......................................24
8.9. Entire Agreement; No Third Party Beneficiaries................................24
8.10. Third Party Beneficiary.............................................................25
8.11. Severability...........................................................................25
8.12. Counterparts..........................................................................25

Asset Purchase Agreement ("Agreement"), dated as of July **23**, 1998, by and between Constantine Sotolidis, an individual residing in _____ County, Pennsylvania ("Seller"), and CCC Bala Cynwyd Cinema Corp., a Delaware corporation ("Buyer").

Seller currently owns and operates a three-screen movie cinema located at 157 Bala Avenue, Bala Cynwyd, Pennsylvania (the "Cinema").

Seller owns the real estate on which the Cinema is located and desires to lease such real estate (the "Leased Real Estate"), as more particularly described on Exhibit A, to the Buyer pursuant to a lease agreement (the "Lease Agreement"), as more particularly described on Exhibit B.

Seller also desires to sell to Buyer, and Buyer desires to purchase from Seller, the Cinema on the terms and subject to the conditions set forth below.

In consideration of the representations, warranties, covenants and agreements contained herein, Seller and Buyer, each intending to be legally bound hereby, agree as set forth below.

## ARTICLE I.
## DEFINITIONS; CONSTRUCTION

1.1.   _Definitions_.  As used in this Agreement, the following terms have the meanings specified in this Section 1.1.  All accounting terms not specifically defined herein shall be construed in accordance with GAAP.

"Additional Deposit" Section has the meaning given that term in Section 2.5.

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with such Person.

"Agreement" means this Asset Purchase Agreement, as it may be amended from time to time.

"Benefit Plan" means any written and unwritten "employee benefit plans" within the meaning of Section 3(3) of ERISA, and any other written and unwritten profit sharing, pension, savings, deferred compensation, fringe benefit, insurance, medical, medical reimbursement, life, disability, accident, post-retirement health or welfare benefit, stock option, stock purchase, sick pay, vacation, employment, severance, termination or other plan, agreement, contract, policy, trust fund or arrangement, whether or not funded and whether or not terminated, (i) maintained or sponsored by Seller, or (ii) with respect to which Seller has or may have Liability or is obligated to contribute, or (iii) that otherwise covers any of the current or former employees of Seller or their beneficiaries, or (iv) as to which any such current or former employees of Seller or their beneficiaries participated or were entitled to participate or accrue or have accrued any rights thereunder.

1    "**Bills**" has the meaning given that term in Section 3.4.

2    "**Business**" means the operation of the Cinema.

3    "**Buyer**" has the meaning given that term in the heading of this Agreement.

4    "**Buyers Damages**" has the meaning given that term in Section 7.2.

5    "**Buyers Indemnitees**" has the meaning given that term in Section 7.2.

6    "**CERCLIS**" means the United States Comprehensive Environmental Response
7    Compensation Liability Information System List pursuant to Superfund.

8    "**Cinema**" has the meaning given that term in the first introductory paragraph of this
9    Agreement.

10   "**Closing**" has the meaning given that term in Section 2.7.

11   "**Closing Date**" has the meaning given that term in Section 2.7.

12   "**Code**" means the United States Internal Revenue Code of 1986, as amended, and the
13   applicable rulings and regulations thereunder.

14   "**Contracts**" has the meaning given that term in Section 3.10.

15   "**Damages**" means Buyers Damages or Sellers Damages, as the case may be.

16   "**Deposit**" has the meaning given that term in Section 2.5.

17   "**EBITDA**" has the meaning given that term in Section 3.4.

18   "**Encumbrance**" means any liability, debt, mortgage, deed of trust, pledge, security
19   interest, encumbrance, option, right of first refusal, agreement of sale, adverse claim, easement,
20   lien, assessment, restrictive covenant, encroachment, burden or charge of any kind or nature
21   whatsoever or any item similar or related to the foregoing.

22   "**Environmental Law**" means any applicable Law relating to public health and safety or
23   protection of the environment, including common law nuisance, property damage and similar
24   common law theories.

25   "**ERISA**" means the United States Employee Retirement Income Security Act of 1974,
26   as amended, and the applicable rulings and regulations thereunder.

27   "**GAAP**" means United States generally accepted accounting principles as they would be
28   applied to the Cinema.

29   "**Governing Documents**" means, with respect to any Person who is not a natural Person,
30   the certificate or articles of incorporation, bylaws, deed of trust, formation or governing

agreement and other charter documents or organization or governing documents or instruments of such Person.

"Governmental Body" means any court, government (federal, state, local or foreign), department, commission, board, bureau, agency, official or other regulatory, administrative or governmental authority or instrumentality.

"Hold-Back Amount" has the meaning given that term in Section 2.8(i).

"Income Statements" has the meaning given that term in Section 3.4.

"Indemnified Party" has the meaning given that term in Section 7.5.

"Indemnifying Party" has the meaning given that term in Section 7.5.

"Initial Deposit" has the meaning given that term in Section 2.5.

"Intellectual Property Rights" means trademark and service mark rights, applications and registrations, trade names, fictitious names, service marks, logos and brand names, copyrights, copyright applications, letters patent, patent applications and licenses of any of the foregoing, improvements, blueprints, specifications, drawings, designs and other intellectual property and proprietary rights.

"IRS" means the United States Internal Revenue Service.

"Law" means any applicable federal, state, municipal, local or foreign statute, law, ordinance, rule, regulation, judgment or order of any kind or nature whatsoever including any public policy, judgment or order of any Governmental Body or principle of common law.

"Lease Agreement" has the meaning given that term in the second introductory paragraph of this Agreement.

"Leased Real Estate" has the meaning given that term in the second introductory paragraph of this Agreement.

"Liabilities" with respect to any Person, means all debts, liabilities and obligations of such Person of any nature or kind whatsoever, whether or not due or to become due, accrued, fixed, absolute, matured, determined, determinable or contingent and whether or not incurred directly by such Person or by any predecessor of such Person, and whether or not arising out of any act, omission, transaction, circumstance, sale of goods or service or otherwise.

"Litigation" has the meaning given that term in Section 3.9.

"Other Agreements" means the Assumption Agreements and the other agreements and instruments of title, assignment or assumption hereunder.

"Permits" has the meaning given that term in Section 3.11.

- 3 -

"**Permitted Encumbrances**" means liens for current taxes not yet due and liens of public record on personal property identified on Schedule 1.1P.

"**Person**" means and includes a natural person, a corporation, an association, a partnership, a limited liability company, a trust, a joint venture, an unincorporated organization, a business, a Governmental Body and any other legal entity.

"**Purchase Price**" has the meaning given that term in Section 2.5.

"**Purchased Assets**" has the meaning given that term in Section 2.1(d).

"**Regulated Material**" means any hazardous substance as defined by any Environmental Law and any other material regulated by any applicable Environmental Law, including petroleum, petroleum-related material, crude oil or any fraction thereof, PCBs and friable asbestos.

"**Related Party**" means (i) Seller, (ii) any Affiliate of Seller, (iii) any officer or director of any Person identified in clauses (i) or (ii) preceding, and (iv) any spouse, sibling, ancestor or lineal descendant of any natural Person identified in any one of the preceding clauses.

"**Retained Assets**" has the meaning given that term in Section 2.3.

"**Retained Liabilities**" has the meaning given that term in Section 2.4.

"**Security Deposits**" means the security deposits under the Real Estate Leases.

"**Seller**" has the meaning given that term in the heading of this Agreement.

"**Seller's Predecessor**" means any predecessor in interest to Seller, whether by merger, combination, reorganization or otherwise.

"**Sellers Damages**" has the meaning given that term in Section 7.3.

"**Sellers Group**" means Seller and any corporation that may be aggregated with Seller under Sections 414(b), (c), (m) or (o) of the Code.

"**Sellers Indemnitees**" has the meaning given that term in Section 7.3.

"**Superfund**" means the United States Comprehensive Environmental Response Compensation and Liability Act of 1980, 42 U.S.C. Sections 6901 et seq., as amended.

"**Tax**" means any domestic or foreign federal, state, county or local tax, levy, impost or other charge of any kind whatsoever, including any interest or penalty thereon or addition thereto, whether disputed or not.

"**Tax Return**" means any return, declaration, report, claim for refund, or information return or statement relating to any Tax, including any schedule or attachment thereto, and including any amendment thereof.

- 4 -

1.2.   Construction. As used herein, unless the context otherwise requires: (i) references to "Article" or "Section" are to an article or section hereof; (ii) all "Exhibits" and "Schedules" referred to herein are to Exhibits and Schedules attached hereto and are incorporated herein by reference and made a part hereof; (iii) "include", "includes" and "including" are deemed to be followed by "without limitation" whether or not they are in fact followed by such words or words of like import; and (iv) the headings of the various articles, sections and other subdivisions hereof are for convenience of reference only and shall not modify, define or limit any of the terms or provisions hereof.

ARTICLE II.

THE TRANSACTION

2.1.   Sale and Purchase of Assets. Except as otherwise provided in Sections 2.2 and 2.3:

(a)   Cinema Purchase. At the Closing, Seller shall sell and transfer to Buyer, and Buyer shall purchase from Seller, all of Seller's properties and business as a going concern, and goodwill and tangible or intangible assets of every kind, nature and description existing on the Closing Date located at or used in connection with the Cinema, whether personal, in electronic form or otherwise, and whether or not any of such assets have any value for accounting purposes or are carried or reflected on or specifically referred to in its books or financial statements, free and clear of all Encumbrances (collectively, the "Purchased Assets").

(b)   Purchased Assets. Without limiting the foregoing, the Purchased Assets shall include the following:

(i)   All of Seller's tangible assets, including office furniture, office equipment and supplies, computer hardware and software, projectors, projector bulbs, ticketing machines, leasehold improvements on or related to the Leased Real Estate or related to the Business;

(ii)   All of Seller's books, records, manuals, documents, books of account, correspondence, sales reports, literature, brochures, advertising material and the like related to the Business;

(iii)   All of Seller's inventory and supplies, including concession products, candy items and paper goods for the Business;

(iv)   All of Seller's rights under leases for personal property, if any;

(v)   All of Seller's rights under the Contracts and the Permits;

(vi)   Seller's rights to the telephone numbers for the Cinema; and

(vii)   The goodwill of the Business.

2.2.   Cash; Etc. Buyer shall purchase petty cash on hand at the Cinema at the close of business on the date immediately preceding the Closing Date, the purchase price of cash to be face value, subject to a physical count of such cash by Buyer and Seller. If the use by customers

- 5 -

of the Cinema of pre-sold tickets sold by Seller shall exceed $100 in the aggregate, Seller shall promptly pay to Buyer an amount equal to such use in excess of $100.

**2.3.** _Retained Assets._ Except for the Purchased Assets, Buyer is not purchasing and Seller is not selling the name "Bala Theater" or any variant or derivative of such name (collectively, the "Retained Assets").

**2.4.** _Retained Liabilities._ Buyer does not hereby and shall not assume or in any way undertake to pay, perform, satisfy or discharge any other Liability of Seller, whether existing on, before or after the Closing Date or arising out of any transactions entered into, or any state of facts existing on, prior to or after the Closing Date (the "Retained Liabilities"), and Seller agrees to pay and satisfy when due all Retained Liabilities. Without limiting the foregoing, the term "Retained Liabilities" shall include Liabilities:

     (i) to any Related Party;

     (ii) for or under any Benefit Plan;

     (iii) for any Taxes, whether or not by reason of, or in connection with, the transactions contemplated by this Agreement; and

     (iv) to any film distributor.

**2.5.** _Purchase Price._ The aggregate purchase price for all of the Purchased Assets shall be $700,000, plus amounts payable for the inventory and petty cash (the "Purchase Price"). At the close of business on the last business day prior to the Closing Date, Seller and Buyer shall take a physical count of Seller's inventory being sold by Seller to Buyer under this Agreement. Seller's inventory shall include concession products, candy items, paper goods, new bulbs and other similar items. Other inventory and equipment shall be considered by Buyer on a per-item basis. Inventory shall be valued at Seller's cost, determined on a first-in-first-out basis. Buyer shall pay Seller for all inventory at the Closing, provided that such inventories do not exceed amounts that would be expected as customary in the ordinary course of business. Upon the execution of this Agreement, Buyer shall deliver to Seller a good faith deposit equal to $10,000 (the "Initial Deposit"). Subsequently, after Buyer has completed its financial due diligence, which shall be done within twenty (20) days after the execution hereof, assuming such financial diligence is satisfactory, Buyer shall pay to Seller an additional deposit of $90,000 (the "Additional Deposit"). (The Initial Deposit and the Additional Deposit are collectively referred to as the Deposit). The Deposit shall be applied against the cash portion of the Purchase Price if there is a Closing hereunder. If there is no Closing hereunder, then Seller may keep the Initial Deposit unless Seller is in material breach hereof and such material breach was the sole cause of the failure to Close hereunder. If there is no Closing and the financial due diligence has been completed, Seller may also keep the Additional Deposit.

**2.6.** _Escrow Agent._ The Deposit shall be held in escrow by Seller's counsel (as a fiduciary). Harry J. Karapalides, Esquire and shall be placed in a non-interest bearing account. It is expressly understood and agreed that Harry J. Karapalides, Esq., is acting as Escrow Agent gratuitously and for the accommodation of the parties hereto, and shall in no way be or become

liable to any of the parties hereto, except for willful and deliberate misconduct with respect to the matters entrusted to him as Escrow Agent.

2.7.   Closing.  The consummation of the purchase and sale of the Purchased Assets, the assumption of the Assumed Liabilities, and the consummation of the other transactions contemplated hereby (the "Closing") shall take place at ___ local time, on [_____ __, 1998] at the offices of Harry J. Karapalides, Esq., 42 Copley Road, Upper Darby, PA  19082, or at such other time, date or place as the parties agree (the "Closing Date").  Closing shall be effective at 12:01 a.m. on the Closing Date.

2.8.   Payment of Purchase Price.  At Closing, the Purchase Price shall be paid by Buyer to Seller as follows:

(i)  by Buyer's delivery to Seller immediately available funds equal to $700,000 less $35,000 (the "Hold-Back Amount") and less the Deposit, according to written wire transfer instructions delivered to Buyer at least three business days prior to the Closing Date; and

(ii)  by Buyer's delivery to Seller of a check in the amount sufficient to purchase Seller's petty cash and inventory pursuant to Section 2.5.

The Hold-Back Amount shall be held by the Buyer for a period of six-months following the six-months following the Closing Date as security for Sellers and Mr. Sotolidis under Section 7.2 of this Agreement.  Should there be no claims for indemnification, actions or causes of action, assessments, lawsuits, damages, etc. made within that six (6) month period, then the hold-back amount shall be automatically released upon the expiration of the time period.

2.9.   Allocation of Purchase Price.  The Purchase Price shall be allocated among the Purchased Assets as follows: $300,000 shall be allocated to furniture, fixtures and equipment; and the remainder of the Purchase Price thereof being allocated to other Purchased Assets, including goodwill and other intangible assets.  Buyer and Seller shall report the federal, state and local income and other tax consequences of the purchase and sale contemplated hereby in a manner consistent with such allocation and shall not take any position inconsistent therewith upon examination of any Tax Return, in any refund claim, in any litigation, or otherwise.

2.10.   Title.  Title to all Purchased Assets shall pass from Seller to Buyer at Closing, subject to the terms and conditions of this Agreement.  Buyer assumes no risk of loss to the Purchased Assets prior to Closing.

2.11.   Certain Consents.  Nothing in this Agreement shall be construed as an attempt to assign any Contract or Permit included in the Purchased Assets which is by its terms or in law nonassignable without the consent of the other party or parties thereto, unless such consent shall have been given, or as to which all the remedies for the enforcement thereof enjoyed by Seller would not, as a matter of law, pass to Buyer as an incident of the assignments provided for by this Agreement.

## ARTICLE III.
## REPRESENTATIONS AND WARRANTIES OF SELLER

- 7 -

As an inducement to Buyer to enter into this Agreement and consummate the transactions contemplated hereby, Seller represents and warrants to Buyer as follows:

**3.1.** **Organization.** Seller has the power and authority to own or lease its properties, carry on the Business as now conducted, enter into this Agreement and the Other Agreements to which it is or is to become a party and perform its obligations hereunder and thereunder.

**3.2.** **Authorization; Enforceability.** This Agreement and each Other Agreement to which Seller is a party have been duly executed and delivered by and constitute the legal, valid and binding obligations of Seller, enforceable against it in accordance with their respective terms. Each Other Agreement to which Seller is to become a party pursuant to the provisions hereof, when executed and delivered by it, will constitute the legal, valid and binding obligation of Seller, enforceable against Seller in accordance with the terms of such Other Agreement. All actions contemplated by this Section have been duly and validly authorized by all necessary proceedings by Seller.

**3.3.** **No Violation of Laws or Agreements; Consents.** Neither the execution and delivery of this Agreement or any Other Agreement to which Seller is or is to become a party, the consummation of the transactions contemplated hereby or thereby nor the compliance with or fulfillment of the terms, conditions or provisions hereof or thereof by Seller will: (i) conflict with, result in a breach of, constitute a default or an event of default (or an event that might, with the passage of time or the giving of notice or both, constitute a default or event of default) under any of the terms of, result in the termination of, result in the loss of any right under, or give to any other Person the right to cause such a termination of or loss under, any Purchased Asset or any other material contract, agreement or instrument to which Seller is a party or by which any of its assets may be bound or affected, (ii) result in the creation, maturation or acceleration of any Assumed Liability or any other Liability of Seller (or give to any other Person the right to cause such a creation, maturation or acceleration), (iii) violate any Law or violate any judgment or order of any Governmental Body to which Seller is subject or by which any of the Purchased Assets or any of its other assets may be bound or affected, or (iv) result in the creation or imposition of any Encumbrance upon any of the Purchased Assets or give to any other Person any interest or right therein. Except for the consents of the landlord under the Lease, no consent, approval or authorization of, or registration or filing with, any Person is required in connection with the execution and delivery by Seller of this Agreement or any of the Other Agreements to which it is or is to become a party pursuant to the provisions hereof or the consummation by Seller of the transactions contemplated hereby or thereby.

**3.4.** **Cinema Income Statement and Financials.** Attached hereto as Exhibit C are the income statements (excluding concessions) for the Cinema for the years ended December 31, 1996, and December 31, 1997 and for the six-month period ended June 30, 1998 (the "**Income Statements**"), Seller's Tax Returns for the year ended December 31, 1997, and Seller's tax and utility bills incurred by Seller for the previous twelve (12) months and maintenance and repair bills incurred by Seller for the previous twelve (12) months, in connection with the Cinema (the "**Bills**"). The Income Statements (i) are correct and complete, (ii) have been prepared in accordance with GAAP on a consistent basis, and (iii) fairly present the results of operation of the Cinema for the period then ended in accordance with GAAP. The Tax Returns are correct copies of the Tax Returns filed by Seller for 1997. The Bills are complete and accurate. Seller

- 8 -

1    has no money due and owing to any film distributor in connection with the Cinema except for
2    money owing in the normal course of business for which an amount is not ascertainable to pay or
3    which is not due prior to Closing.  The aggregate gross box office revenues for the Cinema for
4    calendar year 1997 was $_____ and for the period from January 1, 1998 through June 30,
5    1998 was $_____.  The aggregate earnings before interest, taxes, depreciation and
6    amortization ("EBITDA") for the Cinema for the period from January 1, 1998 through June 30,
7    1998 was at least $_____.

8           3.5.    <u>No Changes</u>.  Since April 1, 1998, Seller has conducted the Business only in the
9    ordinary course.  Without limiting the generality of the foregoing sentence since April 1, 1998,
10    there has not been any: (i) material adverse change in the Purchased Assets, Assumed Liabilities
11    or Leased Real Estate; (ii) damage or destruction to any Purchased Asset or Leased Real Estate,
12    whether or not covered by insurance; (iii) strike or other labor trouble at the Cinema; (iv)
13    increase in the salary, wage or bonus of any employee of the Cinema; or (v) agreement or
14    commitment to do any of the foregoing.  Except as provided on <u>Schedule 3.5</u>, since April 1,
15    1998, Seller has not made any material changes, substitutions or replacements to the equipment,
16    furniture or fixtures at the Cinema.

17           3.6.    <u>Taxes</u>.  Seller, its Affiliates and Predecessors, have filed or caused to be filed on a
18    timely basis, or will file or cause to be filed on a timely basis, all Tax Returns that are required to
19    be filed by them prior to or on the Closing Date, pursuant to the Law of each Governmental
20    Body with taxing power over it.  All such Tax Returns were or will be, as the case may be,
21    correct and complete.  Seller and its Predecessors have paid or will pay all Taxes that have or
22    will become due as shown on such Tax Returns or pursuant to any assessment received as an
23    adjustment to such Tax Returns.  Seller and its Predecessors have withheld and paid all Taxes
24    required to have been withheld in connection with amounts paid or owing to any employee,
25    independent contractor, creditor, stockholder or other third party.

26           3.7.    <u>Undisclosed Liabilities</u>.  Except for the Assumed Liabilities and as disclosed on
27    <u>Schedule 3.7</u>, Seller does not have, and after Closing shall not have, any Liabilities of any kind
28    or nature whatsoever that would attach to the Purchased Assets or for which Buyer may become
29    liable.

30           3.8.    <u>Condition of Assets; Title; Business</u>.  Seller has good, marketable and
31    exclusive title to all of the Purchased Assets being conveyed by it hereunder.  The tangible
32    Purchased Assets are in good operating condition and repair, as of the Closing, suitable for the
33    purposes for which they are used in the Business, and all equipment included in the Purchased
34    Assets have been maintained by qualified professionals.  Except as disclosed on <u>Schedule 3.8</u>
35    and except for Permitted Encumbrances, none of the Purchased Assets is subject to any
36    Encumbrance.  <u>Schedule 3.8</u> identifies any property located on the Leased Real Estate that is not
37    owned by Seller.  The Encumbrances identified on <u>Schedule 3.8</u> will be removed by Seller on or
38    prior to Closing.  The Purchased Assets do not contain any shares of capital stock of or other
39    equity interest in any Person.  On the Closing Date, the Purchased Assets will include at a
40    minimum (i) one functioning xenon projector bulb for each auditorium in the Cinema, and (ii)
41    one new, unused, spare xenon projector bulb for each type of projector at the Cinema location.

- 9 -

**3.9.   No Pending Litigation or Proceedings.**   No action, suit, investigation, claim or proceeding of any nature or kind whatsoever, whether civil, criminal or administrative, by or before any Governmental Body or arbitrator ("Litigation") is pending or, to the knowledge of Seller, threatened against or affecting Seller, the Business, any of the Purchased Assets, the Assumed Liabilities, the Leased Real Estate, or any of the transactions contemplated by this Agreement or any Other Agreement except for claims for personal injury and workers compensation and further except for claims for property damage identified on Schedule 3.9 and claims by Governmental Bodies identified on Schedule 3.9.  There is presently no outstanding judgment, decree or order of any Governmental Body against or affecting Seller, the Business, any of the Purchased Assets, the Assumed Liabilities, the Leased Real Estate, or any of the transactions contemplated by this Agreement or any Other Agreement.  Seller does not have pending any Litigation against any third party related to the Business.

**3.10.   Contracts; Compliance.**   Disclosed on Schedule 3.10 and Exhibit A is a list of each written contract, lease or other agreement, that affects or is used in the Business or the Leased Real Estate (collectively, the "Contracts").  Each Contract is a legal, valid and binding obligation of Seller and is in full force and effect.  Seller and each other party to each Contract has performed all obligations required to be performed by it thereunder and is not in breach or default, and is not alleged to be in breach or default, in any respect thereunder, and, to Seller's knowledge, no event has occurred and no condition or state of facts exists (or would exist upon the giving of notice or the lapse of time or both) that would become or cause a breach, default or event of default thereunder, would give to any Person the right to cause such a termination or would cause an acceleration of any obligation thereunder.  Seller is not currently renegotiating any Contract nor has Seller received any notice of non-renewal or price increase with respect to any Contract.

**3.11.   Permits; Compliance with Law.**   Seller holds and the Purchased Assets include all health department and certificates of occupancy required under any applicable Law in connection with the operation of the Business and use and occupancy of the Leased Real Estate ("Permits").  Seller has received no notice of any violation of Law which has not been remedied or rectified.

**3.12.   Leased Real Estate.**   Schedule 3.12 idenfies the real estate subject to the Lease.  Seller has the right to quiet enjoyment of all Leased Real Estate.  Seller has not received any written or oral notice of assessments for public improvements against any Leased Real Estate or any written or oral notice or order by any Governmental Body, any insurance company that has issued a policy with respect to any of such properties or any board of fire underwriters or other body exercising similar functions that relates to violations of building, safety or fire ordinances or regulations, claims any defect or deficiency with respect to any of such properties or requests the performance of any repairs, alterations or other work to or in any of such properties or in the streets bounding the same, which in each case has not been remedied or rectified.  There is no pending condemnation, expropriation, eminent domain or similar proceeding affecting all or any portion of the Leased Real Estate.  Seller has not received any written notice of any proposed, planned or actual curtailment of service of any utility supplied to the Leased Real Estate.  None of the Leased Real Estate is leased or subleased to any person.

**3.13.   Labor Relations.**  No employee of Seller is represented by any union or other labor organization.  No representation election, arbitration proceeding, grievance, labor strike, dispute, slowdown, stoppage or other labor trouble is pending or, to the knowledge of Seller, threatened against, involving, affecting or potentially affecting Seller.  No complaint against Seller or Seller's Predecessors is pending or, to the knowledge of Seller, threatened before the National Labor Relations Board, the Equal Employment Opportunity Commission or any similar state or local agency, by or on behalf of any employee of Seller or Seller's Predecessor.  To Seller's knowledge, Seller has no Liability for any occupational disease of any of its employees, former employees or others.

**3.14.   Insurance.**  Schedule 3.14 discloses all insurance policies on an "occurrence" basis with respect to which Seller or Seller's Predecessor is the owner, insured or beneficiary.

**3.15.   Intellectual Property Rights.**  Seller neither owns nor is licensee to any form of Intellectual Property Rights related to the Cinema other than the names "_____", and rights to show films to the public according to agreements which are Retained Assets and Retained Liabilities.  To the knowledge of Seller, Seller is not infringing upon the intellectual property rights of any other Person.

**3.16.   Employee Benefits.**  Except for medical and dental coverage, life insurance, and long-term disability plans described on Schedule 3.16 for those managers of the Cinema identified on Schedule 3.16, Seller does not maintain any Benefit Plan for any employees employed at the Cinema.  After the Closing, Buyer will not have any Liability, with respect to any Benefit Plan of Seller or any other member of the Sellers Group, whether as a result of delinquent contributions, distress terminations, fraudulent transfers, failure to pay premiums to the PBGC, withdrawal Liability or otherwise.  Schedule 3.16 identifies the names of all employees of Seller employed at the Cinema, including each listed employee's address, current compensation, vacation time to which he or she is entitled and vacation time so far taken.  Schedule 3.16 also includes copies of Seller's payroll records for all persons currently employed by Seller at the Cinema.  There are no written agreements or arrangements providing for the employment by Seller of any person at the Cinema.  All employees of Seller at the Cinema are employees at will.  Seller does not provide a motor vehicle to any employee of Seller at the Cinema.

**3.17.   Environmental Matters.**  Except as disclosed in Schedule 3.17:

(a)   **Compliance; No Liability.**  Seller and Seller's Predecessors have operated the Business and each parcel of Leased Real Estate in compliance with all applicable Environmental Laws.  Seller is not subject to any Liability, penalty or expense (including legal fees) in connection with the Business or ownership or leasing of the Leased Real Estate by virtue of any violation of any Environmental Law, any environmental activity conducted on or with respect to any property or any environmental condition existing on or with respect to any property, in each case whether or not Seller or Seller's Predecessors permitted or participated in such act or omission.

(b)   **Treatment; CERCLIS.**  Neither Seller nor Seller's Predecessors have treated, stored, recycled or disposed of any Regulated Material on any Leased Real Estate in violation of

- 11 -

applicable Environmental Laws, and, to Seller's knowledge, no other Person has treated, stored, recycled or disposed of any Regulated Material on any part of the Leased Real Estate in violation of applicable Environmental Laws.  There has been no release of any Regulated Material at, on or under any Leased Real Estate.  Neither Seller nor Seller's Predecessors have transported or arranged for the transportation of any Regulated Material from the Cinema to any location that is listed or proposed for listing on the National Priorities List pursuant to Superfund, on CERCLIS or any other location that is the subject of federal, state or local enforcement action or other investigation that may lead to claims against Seller or Seller's Predecessor for cleanup costs, remedial action, damages to natural resources, to other property or for personal injury including claims under Superfund.

(c)    Notices; Existing Claims; Certain Regulated Materials; Storage Tanks.
Neither Seller nor Seller's Predecessors have received any request for information, notice of claim, demand or other notification that it is or may be potentially responsible with respect to any investigation, abatement or cleanup of any threatened or actual release of any Regulated Material.  To Seller's knowledge, Seller is not required to place any notice or restriction relating to the presence of any Regulated Material at any Leased Real Estate.  There has been no past, and there is no pending or contemplated, claim by Seller or Seller's Predecessor under any Environmental Law or Laws based on actions of others that may have impacted on the Leased Real Estate, and neither Seller nor Seller's Predecessors have entered into any agreement with any Person regarding any remedial action or existing environmental Liability or expense with respect to any of the Real Property or any real property adjacent to the Real Property.  To Seller's knowledge, all storage tanks located on the Leased Real Estate, whether underground or aboveground, are disclosed on Schedule 3.17.  Seller has not closed or caused to be closed any underground storage tank on the Leased Real Estate.

3.18.    Additional Theaters.  Seller has no knowledge, after due inquiry, of the intention by any Person to construct or open any movie theater within a five-mile radius of the Cinema.

3.19.    Finders' Fees.  Neither Seller nor any of its officers, managers or employees has employed any broker or finder or incurred any Liability for any brokerage fee, commission or finders' fee in connection with any of the transactions contemplated hereby or by any Other Agreement.

ARTICLE IV.
REPRESENTATIONS AND WARRANTIES OF BUYER

As an inducement to Seller to enter into this Agreement and consummate the transactions contemplated hereby, Buyer represents and warrants to Seller as follows:

4.1.    Organization.  Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware, and has the corporate power and authority to own or lease its properties, carry on its business, enter into this Agreement and the Other Agreements to which it is or is to become a party and perform its obligations hereunder and thereunder.

- 12 -

**4.2.** **Authorization and Enforceability.** This Agreement and Other Agreement to which Buyer is a party have been duly executed and delivered by and constitute the legal, valid and binding obligations of Buyer, enforceable against it in accordance with their respective terms. Each Other Agreement to which Buyer is to become a party pursuant to the provisions hereof, when executed and delivered by Buyer, will constitute the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with the terms of such Other Agreement. All actions contemplated by this Section have been duly and validly authorized by all necessary proceedings by Buyer.

**4.3.** **No Violation of Laws; Consents.** Neither the execution and delivery of this Agreement or any Other Agreement to which Buyer is or is to become a party, the consummation of the transactions contemplated hereby or thereby nor the compliance with or fulfillment of the terms, conditions or provisions hereof or thereof by Buyer will: (i) contravene any provision of the Governing Documents of Buyer, (ii) conflict with, result in a breach of, constitute a default or an event of default (or an event that might, with the passage of time or the giving of notice or both, constitute a default or event of default) under any of the terms of, result in the termination of, result in the loss of any right under, or give to any other Person the right to cause such a termination of or loss under, any contract, agreement or instrument to which Buyer is a party or by which any of its assets may be bound or affected, (iii) result in the creation, maturation or acceleration of Liability of Buyer (or give to any other Person the right to cause such a creation, maturation or acceleration), or (iv) violate any Law or any judgment or order of any Governmental Body to which Buyer is subject or by which any of its assets may be bound or affected. Except for the consent of Provident Bank or its successor as lender to Buyer, no consent, approval or authorization of, or registration or filing with, any Person is required in connection with the execution and delivery by Buyer of this Agreement or any of the Other Agreements to which Buyer is or is to become a party pursuant to the provisions hereof or the consummation by Buyer of the transactions contemplated hereby or thereby.

**4.4.** **No Pending Litigation or Proceedings.** No Litigation is pending or, to the knowledge of Buyer, threatened against or affecting Buyer or Affiliate of Buyer in connection with any of the transactions contemplated by this Agreement or any Other Agreement to which Buyer is or is to become a party or that would, to Buyer's knowledge, have a material adverse effect on Buyer's business considered as a whole. There is presently no outstanding judgment, decree or order of any Governmental Body against or affecting Buyer or any Affiliate of Buyer in connection with the transactions contemplated by this Agreement or any Other Agreement to which Buyer is or is to become a party.

**4.5.** **Finders' Fees.** Neither Buyer nor any of its officers, directors or employees has employed any broker or finder or incurred any liability for any brokerage fee, commission or finders' fee in connection with any of the transactions contemplated hereby.

ARTICLE V.
CERTAIN COVENANTS

**5.1.** **Conduct of Business Pending Closing.** From and after the date hereof and until the Closing Date, unless Buyer shall otherwise consent in writing, Seller shall conduct its affairs as follows:

- 13 -

(a)  Ordinary Course; Compliance.  The Business shall be conducted only in the ordinary course and consistent with past practice.  Seller shall maintain the Purchased Assets, the Leased Real Estate consistent with past practice and shall comply in a timely fashion with the provisions of all Contracts and Permits and its other agreements and commitments.  Seller shall use its best efforts to keep the Business organization intact, keep available the services of its present employees and preserve the goodwill of its suppliers, patrons and others having business relations with it.  Seller shall maintain in full force and effect its policies of insurance, subject only to variations required by the ordinary operations of the Business, or else shall obtain, prior to the lapse of any such policy, substantially similar coverage with insurers of recognized standing.

(b)  Prohibited Transactions.  Seller shall not: (i) amend or terminate any Contract or Permit; (ii) fail to pay any Liability or charge when due, other than Liabilities contested in good faith by appropriate proceedings; (iii) enter into any employment or consulting contract or arrangement with any employee of the Cinema; (iii) take any action or omit to take any action that is reasonably likely to result in the occurrence of any event described in Section 3.5; or (vi) take any action or omit to take any action that will cause a breach or termination of any Permit or Contract, other than termination by fulfillment of the terms thereunder.

(c)  Access, Information and Documents.  Seller shall give to Buyer and to Buyer's employees and representatives (including accountants, attorneys, environmental consultants and engineers) access during normal business hours to all of the properties, books, contracts, commitments, records, officers, personnel and accountants (including independent public accountants and their workpapers) of Seller and shall furnish to Buyer all such documents and copies of documents and all information with respect to the properties, Liabilities and affairs of Seller (solely as they relate to the Cinema) as Buyer may reasonably request, including but not limited to weekly reports of gross box office and concession receipts at the Cinema, at the same time such reports are available to Seller's management.

5.2.  Fulfillment of Agreements.  Each party hereto shall use its best efforts to cause all of those conditions to the obligations of the other under Article VI that are not beyond its reasonable control to be satisfied on or prior to the Closing and shall use its best efforts to take, or cause to be taken, all action and to do, or cause to be done, all things necessary, proper or advisable to consummate and make effective the transactions contemplated by this Agreement.  Seller shall, prior to Closing, obtain the consents referred to in Section 3.3.

5.3.  Employment, Severance and Termination Payments.  Seller agrees to pay, perform and discharge any and all severance payments, payroll and employment related Liabilities with respect to employees of Seller at the Cinema accruing up to the close of business on the date immediately preceding the Closing Date or which result from the transfer of the Purchased Assets hereunder and the employment by Buyer of those employees and shall indemnify and hold harmless Buyer and its directors, officers and Affiliates from and against any and all losses, Liabilities, damages, costs and expenses, including reasonable legal fees and disbursements, that any of the aforesaid may suffer or incur by reason of or relating to any such Liabilities.

- 14 -

**5.4.** <u>Seller's Employees</u>.  Buyer shall have the right, but not the obligation, to offer employment to any of the employees of Seller who are employed at the Cinema.  At or prior to the Closing, Seller shall fully compensate all employees of Seller at the Cinema for all work performed through and including the Closing Date.  Seller does not guaranty that any of the employees to which Buyer will offer employment will accept such offer of employment.

**5.5.** <u>Workers' Compensation and Disability Claims</u>.

(a) <u>Seller's Liability</u>.  Seller shall remain liable for all Liability for all workers' compensation, disability and occupational diseases of or with respect to all of Seller's employees attributable to injuries, claims, conditions, events and occurrences occurring on or before the Closing Date.

(b) <u>Buyer's Liability</u>.  Buyer shall be liable for all Liability for all workers' compensation, disability and occupational diseases of or with respect to all of employees of Seller hired by Buyer attributable to injuries, claims, conditions, events and occurrences first occurring after the Closing Date.

**5.6.** <u>Covenant Not to Compete</u>.

(a) <u>Restriction</u>.  For a period of five years from and after the Closing Date, Seller shall not, directly or indirectly, own, manage, operate, join, control or participate in the ownership, management, operation or control of, or be employed or otherwise connected as an officer, employer, stockholder, partner or otherwise with, any cinema within a seven mile radius of (i) the Cinema or (ii) any theater owned directly or indirectly by Clearview Cinema Group, Inc., a Delaware corporation ("CCG"), on the date immediately following the Closing Date. Ownership of not more than 2% of the outstanding stock of any publicly traded company shall not be a violation of this Section.

(b)   Enforcement. The restrictive covenant contained in this Section is a covenant independent of any other provision of this Agreement and the existence of any claim that Seller may allege against any other party to this Agreement, whether based on this Agreement or otherwise, shall not prevent the enforcement of this covenant. Seller agrees that Buyer's remedies at law for any breach or threat of breach by Seller of the provisions of this Section will be inadequate, and that Buyer shall be entitled to an injunction or injunctions to prevent breaches of the provisions of this Section and to enforce specifically the terms and provisions hereof, in addition to any other remedy to which Buyer may be entitled at law or equity. In the event of litigation regarding this covenant not to compete, the prevailing party in such litigation shall, in addition to any other remedies the prevailing party may obtain in such litigation, be entitled to recover from the other party its reasonable legal fees and out of pocket costs incurred by such party in enforcing or defending its rights hereunder. The length of time for which this covenant not to compete shall be in force shall not include any period of violation or any other period required for litigation during which Buyer seek to enforce this covenant. Should any provision of this Section be adjudged to any extent invalid by any competent tribunal, such provision will be deemed modified to the extent necessary to make it enforceable.

5.7.   Publicity. Seller and Buyer shall not issue any press release or otherwise make any announcements to the public or the employees of Seller with respect to this Agreement prior to the Closing Date without the prior written consent of the other, except as required by Law.

5.8.   Transitional Matters. Seller shall cooperate with and assist Buyer and its authorized representatives in order to provide, to the extent reasonably requested by Buyer, an efficient transfer of control of the Purchased Assets and the Leased Real Estate and to avoid any undue interruption in the activities and operations of the Business and the Leased Real Estate following the Closing Date. Seller shall not cause any utilities to be disconnected until the Buyer shall have established an account for such utility in Buyer's own name. Seller shall assist in transferring to each Buyer the telephone numbers for the Cinema. Buyer shall be liable to Seller for the utility payments for any utility maintained by the Seller after the Closing Date. Seller shall cooperate with Provident Bank or its successor as lender to CCG in connection with the consummation by Buyer of the transactions provided hereunder, as reasonably requested by such lender. Prior to Closing, Seller shall remove all of its movie trailers from films at the Cinema.

5.9.   Books and Records. Seller shall not destroy or dispose of any books, records, and files relating to the Business to the extent that they pertain to the Business prior to the Closing Date.

5.10.   Permits. Seller shall use its best efforts to provide to Buyer valid Permits for the Cinema prior to Closing. In the event that Seller is unable to do so by Closing, then Seller shall provide Buyer with such Permits within 30 days after Closing.

5.11.   Right of First Refusal. Seller and Mr. Sotolidis hereby grant to Buyer and CCG a right of first refusal to purchase any movie theater property (whether in corporate solution or otherwise, and including properties owned or being developed) within the Philadelphia metropolitan area in which Mr. Sotolidis or Seller have a majority or controlling ownership interest and which is proposed to be sold by Seller or Mr. Sotolidis within the five-year period ending on the fifth anniversary of the Closing Date. The terms of such right for each theater

- 16 -

property will be the same as or substantially similar to the terms set forth in the representative Right of First Refusal Agreement which is attached hereto as Exhibit G. As each such theater property is identified, Seller or Mr. Sotolidis shall notify Buyer and CCG of such property and Buyer or CCG and Seller and Mr. Sotolidis shall, as a formality, promptly memorialize their agreement with respect to such theater by completing the information in the form of such Right of First Refusal Agreement taking into account the nature and scope of Mr. Sotolidis' or Seller's ownership interest in such property, and executing and delivering such completed Right of First Refusal Agreement. The provisions of this Section 5.11 are intended to be legally binding notwithstanding that theater properties subject to this right have not yet been separately identified herein.

## ARTICLE VI.
## CONDITIONS TO CLOSING; TERMINATION

**6.1.**   **Conditions Precedent to Obligation of Buyer.**  The obligation of Buyer to proceed with the Closing under this Agreement is subject to the fulfillment prior to or at Closing of the following conditions, any one or more of which may be waived in whole or in part by Buyer at Buyer's sole option:

(a)   **Bringdown of Representations and Warranties; Covenants.**  Each of the representations and warranties of Seller contained in this Agreement shall be true and correct in all material respects on and as of the Closing Date, with the same force and effect as though such representations and warranties had been made on, as of and with reference to the Closing Date. Seller shall have performed in all respects all of the covenants and complied with all of the provisions required by this Agreement to be performed or complied with by it at or before the Closing.

(b)   **Litigation.**  No statute, regulation or order of any Governmental Body shall be in effect that restrains or prohibits the transactions contemplated hereby or that would, after Closing, limit or adversely affect Buyer's ownership of the Purchased Assets or the Leased Real Estate in a manner different from Seller's, and there shall not have been threatened, nor shall there be pending, any action or proceeding by or before any Governmental Body challenging the lawfulness of or seeking to prevent or delay any of the transactions contemplated by this Agreement or any of the Other Agreements or seeking monetary or other relief by reason of the consummation of any of such transactions.

(c)   **No Material Adverse Change.**  Between the date hereof and the Closing Date, there shall have been no material adverse change, regardless of insurance coverage therefor, in the Business or any of the Purchased Assets, results of operations, prospects or condition, of the Cinema or the Leased Real Estate.

(d)   **Closing Certificate.**  If Closing occurs after the date hereof, Seller shall have delivered a certificate, dated the Closing Date certifying to the fulfillment of the conditions set forth in subparagraphs (a), (b) and (c) of this Section.  Such certificate shall constitute a representation and warranty of Seller with regard to the matters therein for purposes of this Agreement.

- 17 -

(e)     **Closing Documents.** Buyer shall have received the other documents referred to in Section 6.3(a). All agreements, certificates, opinions and other documents delivered by Seller to Buyer hereunder shall be in form and substance reasonably satisfactory to Buyer.

(f)     **Title Insurance.** Buyer, at its sole cost and expense, shall have obtained for all Leased Real Estate final marked commitments to issue to Buyers ALTA (1990-Form B with appropriate state endorsements) leasehold policies of title insurance in coverage amounts equal to the fair market values of the Leased Real Estate, insuring good title to the Leased Real Estate with mechanic's liens coverage and such endorsements as Buyer may have reasonably requested and with exceptions only for ALTA standard printed exceptions (other than mechanic's and materialmen's liens and rights of possession), and Permitted Encumbrances.

(g)     **Release or Termination of Mortgage and Other Encumbrances.** Seller shall have caused all of its liens on the Purchased Assets to be released.

(h)     **Leased Real Estate.** Buyer shall have received from the Seller a Lease Agreement in form and substance satisfactory to Buyer.

(i)     **Consents.** Seller shall have received the other consents, approvals and actions of the Persons identified in Section 3.3.

(j)     **New Theater Transition Forms.** Buyer shall have received a New Theater Transition Form for the Cinema from Seller.

(k)     **Due Diligence.** Buyer shall have been satisfied with its due diligence investigation of the Cinema.

**6.2.**     **Conditions Precedent to Obligation of Seller.** The obligation of Seller to proceed with the Closing under this Agreement is subject to the fulfillment prior to or at Closing of the following conditions, any one or more of which may be waived in whole or in part by Seller at Seller's sole option:

(a)     **Bringdown of Representations and Warranties; Covenants.** Each of the representations and warranties of Buyer contained in this Agreement shall be true and correct in all material respects on and as of the Closing Date, with the same force and effect as though such representations and warranties had been made on, as of and with reference to the Closing Date. Buyer shall have performed all of the covenants and complied in all respects with all of the provisions required by this Agreement to be performed or complied with by it at or before the Closing.

(b)     **Litigation.** No statute, regulation or order of any Governmental Body shall be in effect that restrains or prohibits the transactions contemplated hereby, and there shall not have been threatened, nor shall there be pending, any action or proceeding by or before any Governmental Body challenging the lawfulness of or seeking to prevent or delay any of the

- 18 -

transactions contemplated by this Agreement or the Other Agreements or seeking monetary or other relief by reason of the consummation of such transactions.

(c) <u>Closing Certificate</u>. If Closing occurs after the date hereof, Buyer shall have delivered a certificate, dated the Closing Date certifying to the fulfillment of the conditions set forth in subparagraphs (a) and (b) of this <u>Section 6.2</u>. Such certificate shall constitute a representation and warranty of Buyer with regard to the matters therein for purposes of this Agreement.

(d) <u>Closing Documents</u>. Seller shall also have received the other documents referred to in <u>Section 6.3(b)</u>. All agreements, certificates, opinions and other documents delivered by Buyer to Seller hereunder shall be in form and substance reasonably acceptable to counsel for Seller, in the exercise of such counsel's reasonable professional judgment.

6.3.   <u>Deliveries and Proceedings at Closing</u>.

(a) <u>Deliveries by Seller</u>. Seller shall deliver or cause to be delivered to Buyer at the Closing:

(i) General warranty bills of sale and instrument of assignment to the Purchased Assets in the form attached hereto as <u>Exhibit D</u>.

(ii) Assignments of all transferable or assignable licenses, Permits and warranties relating to the Purchased Assets and of any Intellectual Property included in the Purchased Assets, duly executed and in forms acceptable to Buyer.

(iii) The opinion of Harry J. Karapalides,, legal counsel to Seller, in substantially the form of <u>Exhibit E</u>.

(iv) Keys for the Cinema.

(v) All vendor warranties (including those for the roofs on each Cinema) respecting the Purchased Assets.

(vi) Such other agreements and documents as Buyer may reasonably request.

(b) <u>Deliveries by Buyer</u>. Buyer shall deliver or cause to be delivered to Seller at the Closing:

(i) A certificate of the appropriate public official to the effect that Buyer is a validly existing corporation in the State of Delaware as of a date not more than 15 business days prior to the Closing Date.

(ii) Incumbency and specimen signature certificates signed by the officers of Buyer and certified by the Secretary of Buyer.

- 19 -

(iii)  True and correct copies of the Certificates of Incorporation of Buyer as of a date not more than 15 business days prior to the Closing Date, certified by the Secretary of State of Delaware.

(iv)  A certificate of the Secretary of Buyer (A) setting forth all resolutions of the Board of Directors of Buyer authorizing the execution and delivery of this Agreement and Other Agreements and the performance by Buyer of the transactions contemplated hereby and thereby, certified by the Secretary of Buyer and (B) to the effect that the Certificate of Incorporation of Buyer delivered pursuant to Section 6.3(b)(iv) were in effect at the date of adoption of such resolutions, the date of execution of this Agreement and the Closing Date.

(v)  The opinion of Kirkpatrick & Lockhart LLP, counsel to Buyer, in substantially the form of Exhibit F.

(vi)  Such other agreements and documents as Seller may reasonably request.

6.4.    Termination.

(a)    Mutual Consent; Failure of Conditions.  Except as provided in Section 6.4(b), this Agreement may be terminated at any time prior to Closing by: (i) mutual consent of Buyer, on the one hand, and Seller, on the other hand; (ii) Buyer, if any of the conditions specified in Section 6.1 hereof shall not have been fulfilled by August 12, 1998 and shall not have been waived by Buyer; (iii) Buyer, for any reason or for no reason, during the course of its financial due diligence, which, in no event, shall run for longer than twenty (20) days after the execution of this Agreement; or (iv) Seller, if any of the conditions specified in Section 6.2 hereof shall not have been fulfilled by August 12, 1998 and shall not have been waived by Seller.  In the event of termination of this Agreement by either Buyer or Seller pursuant to clause (ii) or (iii) of the immediately preceding sentence, Buyer, on the one hand, and Seller, on the other hand, shall be liable to the other for any breach hereof by such party, which breach led to such termination, and the rights and obligations of the parties set forth in Sections 7.2, 7.3 and 8.1 shall survive such termination.  Buyer and Seller shall also be entitled to seek any other remedy to which it may be entitled at law or in equity in the event of such termination, which remedies shall include injunctive relief and specific performance.  Notwithstanding the foregoing, in the event that this Agreement is terminated by one party hereto pursuant to clause (ii) or (iii) of the first sentence of this Section solely as a result of a breach by the other party hereto of a representation or warranty of such other party as of a date after the date of this Agreement, which breach could not have been reasonably anticipated by such other party and was beyond the reasonable control of such other party, then the remedy of the party terminating this Agreement shall be limited solely to recovery of all of such party's costs and expenses incurred in connection herewith.

(b)    Casualty Damage.  Notwithstanding anything else herein to the contrary, if prior to Closing the Purchased Assets (or any portion thereof) are damaged by fire or any other cause, the reasonable estimate of the immediate repair of which would cost more than $50,000, Buyer at its option, which may be exercised by written notice given to Seller within ten business days after Buyer's receipt of notice of such loss, may declare this Agreement null and void, or Buyer may Close subject to reduction of the Purchase Price by the amount of any applicable insurance deductible which shall be paid by Buyer and assignment to Buyer of the proceeds from any

- 20 -

1  insurance carried by Seller covering such loss.  If prior to Closing the Purchased Assets (or any
2  portion thereof) are damaged by fire or any other cause, the reasonable estimate of the repair of
3  which would cost $50,000 or less, such event shall not excuse Buyer from their obligations under
4  this Agreement, but the Purchase Price shall be reduced by an amount equal to the amount of
5  such cost and Seller shall be entitled to retain the net insurance proceeds collected or to be
6  collected by Seller.

7                                      ARTICLE VII.
8                  SURVIVAL OF REPRESENTATIONS; INDEMNIFICATION

9        7.1.   Survival of Representations.  All representations, warranties and agreements
10  made by any party in this Agreement or pursuant hereto shall survive the Closing; provided,
11  however, that, representations and warranties hereunder shall survive for a period of three years
12  after the Closing Date, with the exception of the representations and warranties contained in
13  Sections 3.1, 3.2, 3.3 and 3.6, the first sentence of Section 3.8, and Sections 4.1, 4.2 and 4.3, all
14  of which shall survive for the period of the applicable statute of limitations plus 90 days.  All
15  claims for damages made by virtue of any representations, warranties and agreements herein
16  shall be made under, and subject to the limitations set forth in, this Article VII.  The
17  representations and warranties set forth in Articles III and IV are cumulative, and any limitation
18  or qualification set forth in any one representation and warranty therein shall not limit or qualify
19  any other representation and warranty therein.  Except the representations and warranties of each
20  party hereto expressly contained in this Agreement or the Other Agreements, no party hereto is
21  making and specifically disclaims any representations or warranties of any kind or character,
22  express or implied.
23

24        7.2.   Indemnification by Seller.  Seller shall indemnify, defend, save and hold Buyer
25  and its officers, directors, employees, agents and Affiliates (collectively, "Buyers Indemnitees")
26  harmless from and against all demands, claims, actions or causes of action, assessments, losses,
27  damages, deficiencies, Liabilities, costs and expenses (including reasonable legal fees, interest,
28  penalties, and all reasonable amounts paid in investigation, defense or settlement of any of the
29  foregoing; collectively, "Buyers Damages") asserted against, imposed upon, resulting to,
30  required to be paid by, or incurred by any Buyer Indemnitees, directly or indirectly, in
31  connection with, arising out of, resulting from, or which would not have occurred but for, (i) a
32  breach of any representation or warranty made by Seller in this Agreement, in any certificate or
33  document furnished pursuant hereto by Seller or any Other Agreement to which Seller is or is to
34  become a party, (ii) a breach or nonfulfillment of any covenant or agreement made by Seller in or
35  pursuant to this Agreement and in any Other Agreement to which Seller is or is to become a
36  party, (iii) any Retained Liability, (iv) any successor liability (or Liabilities based on similar
37  theories) arising out of any facts or circumstances occurring prior to the Closing Date or Liability
38  arising out of or attaching by virtue of Seller being a member of a controlled group or affiliated
39  group of entities, and (v) the provisions of 29 U.S.C. § 1161-1168, as same may be amended
40  from time to time, and the regulations and rulings thereunder, with respect to the employees of
41  Seller at the Cinema.

42        7.3.   Indemnification by Buyer.  Buyer shall indemnify, defend, save and hold Seller
43  and its officers, directors, employees, Affiliates and agents (collectively, "Sellers Indemnitees")
44  harmless from and against any and all demands, claims, actions or causes of action, assessments,

- 21 -

1  losses, damages, deficiencies, Liabilities, costs and expenses (including reasonable legal fees,
2  interest, penalties, and all reasonable amounts paid in investigation, defense or settlement of any
3  of the foregoing; collectively, "Sellers Damages") asserted against, imposed upon, resulting to,
4  required to be paid by, or incurred by any Sellers Indemnitees, directly or indirectly, in
5  connection with, arising out of, resulting from, or which would not have occurred but for, (i) a
6  breach of any representation or warranty made by Buyer in this Agreement or in any certificate
7  or document furnished pursuant hereto by Buyer or any Other Agreement to which Buyer is or is
8  to become a party, (ii) a breach or nonfulfillment of any covenant or agreement made by any
9  Buyer in or pursuant to this Agreement and in any Other Agreement to which any Buyer is or is
10 to become a party, and (iii) any Assumed Liability.

11  **7.4.**  _Waiver of Statute of Limitations_.  Each party hereto waives any applicable
12 statute of limitations that may be applicable to Damages arising under clauses (iii), (iv) and (v) of
13 Section 7.2 and clause (iii) of Section 7.3.

14  **7.5.**  _Notice of Claims_.  If any Buyers Indemnitee or Sellers Indemnitee (an
15 "Indemnified Party") believes that it has suffered or incurred or will suffer or incur any
16 Damages for which it is entitled to indemnification under this Article VII, such Indemnified
17 Party shall so notify the party or parties from whom indemnification is being claimed (the
18 "Indemnifying Party") with reasonable promptness and reasonable particularity in light of the
19 circumstances then existing.  If any action at law or suit in equity is instituted by or against a
20 third party with respect to which any Indemnified Party intends to claim any Damages, such
21 Indemnified Party shall promptly notify the Indemnifying Party of such action or suit.  The
22 failure of an Indemnified Party to give any notice required by this Section shall not affect any of
23 such party's rights under this Article VII or otherwise except and to the extent that such failure is
24 actually prejudicial to the rights or obligations of the Indemnified Party.

25  **7.6.**  _Third Party Claims_.  The Indemnifying Party shall have the right to conduct and
26 control, through counsel of its choosing, the defense of any third party claim, action or suit, and
27 the Indemnifying Party may compromise or settle the same, provided that the Indemnifying Party
28 shall give the Indemnified Party advance notice of any proposed compromise or settlement.  The
29 Indemnifying Party shall permit the Indemnified Party to participate in the defense of any such
30 action or suit through counsel chosen by the Indemnified Party, provided that the fees and
31 expenses of such counsel shall be borne by the Indemnified Party (subject to reimbursement
32 pursuant to Section 7.1 or 7.2, as the case may be).

33  **7.7.**  _Payment_.  All indemnification payments under this Article VII shall be made
34 promptly in cash.

35  **ARTICLE VIII.**
36  **MISCELLANEOUS**

37  **8.1.**  _Costs and Expenses_.  Buyer, on the one hand, and Seller, on the other hand, shall
38 each pay its respective expenses, brokers' fees and commissions and expenses incurred in
39 connection with this Agreement and the transactions contemplated hereby, including all
40 accounting, legal and appraisal fees and settlement charges.  All transfer taxes, if any, incurred as
41 a result of the transfer of the Purchased Assets shall be paid by Seller.

- 22 -

8.2.   Proration of Expenses.  All accrued expenses associated with the Leased Real Estate included in the Purchased Assets, such as rents and other charges under the Lease Agreements, electricity, gas, water, sewer, telephone, property taxes, security services and similar items, shall be prorated between Buyer and Seller as of the Closing Date.  Buyer and Seller shall settle such amounts within 30 days after Closing.

8.3.   Bulk Sales.  The parties hereto waive compliance with the provisions of any bulk sales law applicable to the transactions contemplated hereby, and, notwithstanding anything else in this Agreement to the contrary, Seller shall hold Buyer harmless from and against all claims asserted against the Purchased Assets or the Buyer pursuant to such bulk sales laws.  Seller agrees to pay timely its account creditors with respect to liabilities not being assumed by Buyer hereunder.

8.4.   Further Assurances.  Seller shall, at any time and from time to time on and after the Closing Date, upon the reasonable request by Buyer and without further consideration, take or cause to be taken such actions and execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, such instruments, documents, transfers, conveyances and assurances as may be required or desirable for the better conveying, transferring, assigning, delivering, assuring and confirming the Purchased Assets to Buyer.

8.5.   Notices.  All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed to have been duly given or made (i) the fifth business day after the date of mailing, if delivered by registered or certified mail, postage prepaid, (ii) upon delivery, if sent by hand delivery, (iii) upon delivery, if sent by prepaid courier, with a record of receipt, or (iv) the next day after the date of dispatch, if sent by cable, telegram, facsimile or telecopy (with a copy simultaneously sent by registered or certified mail, postage prepaid, return receipt requested), to the parties at the following addresses:

(i)   if to Buyer, to:

97 Main Street,
Chatham, NJ  07928
Telecopy: (973) 377-4303
Attention:   Robert D. Lister, Esq.
General Counsel

- 23 -

(ii)     if to Seller to:

_____
_____
_____

Telecopy:
Attention:  Constantine Sotolidis

with a required copy to:

Harry J. Karapalides, Esq.
42 Copley Road
Upper Darby, Pennsylvania  19082
Telecopy:

Any party hereto may change the address to which notice to it, or copies thereof, shall be addressed, by giving notice thereof to the other parties hereto in conformity with the foregoing.

8.6.    Currency.  All currency references herein are to United States dollars.

8.7.    Offset; Assignment; Governing Law.  Buyer shall be entitled to offset or recoup from amounts due to Seller from Buyer hereunder or under any Other Agreement against any obligations of Seller to Buyer hereunder or under any Other Agreement (including Buyers Damages).  This Agreement and all the rights and powers granted hereby shall bind and inure to the benefit of the parties hereto and their respective permitted successors and assigns.  This Agreement and the rights, interests and obligations hereunder may not be assigned by any party hereto without the prior written consent of the other parties hereto, except that Buyer may make such assignments to any Affiliate of Buyer provided that Buyer remains liable hereunder, and, further, Buyer may collaterally assign its rights hereunder to Provident Bank or other commercial lending institution.  This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania without regard to its conflict of law doctrines.

8.8.    'Amendment and Waiver; Cumulative Effect.  To be effective, any amendment or waiver under this Agreement must be in writing and be signed by the party against whom enforcement of the same is sought.  Neither the failure of any party hereto to exercise any right, power or remedy provided under this Agreement or to insist upon compliance by any other party with its obligations hereunder, nor any custom or practice of the parties at variance with the terms hereof shall constitute a waiver by such party of its right to exercise any such right, power or remedy or to demand such compliance.  The rights and remedies of the parties hereto are cumulative and not exclusive of the rights and remedies that they otherwise might have now or hereafter, at law, in equity, by statute or otherwise.

8.9.    Entire Agreement; No Third Party Beneficiaries.  This Agreement and the Schedules and Exhibits set forth all of the promises, covenants, agreements, conditions and undertakings between the parties hereto with respect to the subject matter hereof, and supersede all prior or contemporaneous agreements and understandings, negotiations, inducements or conditions, express or implied, oral or written.  This Agreement is not intended to confer upon

- 24 -

any Person other than the parties hereto any rights or remedies hereunder, except the provisions of Sections 7.2 and 7.3 relating to Buyers Indemnitees.

8.10.   **Third Party Beneficiary.**  No Person is an intended third party beneficiary of this Agreement.

8.11.   **Severability.**  If any term or other provision of this Agreement is held by a court of competent jurisdiction to be invalid, illegal or incapable of being enforced under any rule of Law in any particular respect or under any particular circumstances, such term or provision shall nevertheless remain in full force and effect in all other respects and under all other circumstances, and all other terms, conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the fullest extent possible.

8.12.   **Counterparts.**  This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original but all of which together shall be deemed to be one and the same instrument.

1      **IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the
2  day and year first above written.

3
4                           **CONSTANTINE SOTOLIDIS**, Individually
5
6
7                          Constantine Sotolidis

8
9                           **CCC BALA CYNWYD CINEMA CORP.**
10
11
12                     By:
13
14                       Name:  A. Dale Mayo
15                       Title:   President
16
17

- 26 -

List of Schedules and Exhibits

| | | |
|---|---|---|
| 3 | Schedule 1.1P | Permitted Encumbrances |
| 4 | Schedule 3.5 | No Changes |
| 5 | Schedule 3.7 | Undisclosed Liabilities |
| 6 | Schedule 3.8 | Title; Business |
| 7 | Schedule 3.9 | Litigation or Proceedings |
| 8 | Schedule 3.10 | Contracts |
| 9 | Schedule 3.12 | Leased Real Estate |
| 10 | Schedule 3.14 | Insurance |
| 11 | Schedule 3.16 | Employee Benefits |
| 12 | Schedule 3.17 | Environmental Matters |
| 13 | Exhibit A | Leased Real Estate |
| 14 | Exhibit B | The Lease Agreement |
| 15 | Exhibit C | Income Statements |
| 16 | Exhibit D | Form of General Warranty Bill of Sale |
| 17 | Exhibit E | Form of Opinion of Harry J. Karapalides |
| 18 | Exhibit F | Form of Opinion of Kirkpatrick & Lockhart LLP |
| 19 | Exhibit G | Form of Right of First Refusal Agreement |

Exhibit "C"

December 12, 2013

kcastagna@kanepugh.com

A. Brooks Hock, Esquire (Williams Mullen)
Williams Mullen Center
200 South 10th Street, Suite 1600
Richmond, VA 23219

      **RE:**    **BTC HOLDINGS V. SOTOLIDIS, ET AL**
                   **2013-31096**

Dear Mr. Hock:

      Pursuant to the lease between Constantine, Isaak and Irene Sotolidis and BTC Holdings 432, LLC, BTC Venture 18, LLC is a guarantor under the lease. You are being provided this notice as required under the provisions of the guaranty. As a follow-up to my letter of November 26, 2013, BTC Holdings 432, LLC remains in default under the lease. BTC Holdings 432, LLC remains in default under the lease. Landlord is now exercising its rights under paragraph 10(1) of the lease and demanding acceleration of all rent due under the lease for the unexpired balance of the term. The rent due is calculated as follows:

      Unpaid rent to date: $21,500.00
      Rent for unexpired term of lease: $560,000.00
      Additional Rent under lease:
- Unpaid 2013 Taxes: $11,566.07
- Taxes for 2014-2018: $60,508.44
- Unpaid 2013 Insurance premiums: $5,895.00



- Insurance premiums from 2014-2018: $23,580.00
- Unpaid Sewer fee: $3,405.77
- Estimated Sewer fees for 2014-2018: $12,000
- Unpaid Water bills: $1,558.71
- Estimated Water bills: $16,800.00

Total due: $716,813.99

You are hereby notified that you have ten (10) days to pay the total due of $716,813.99. If the full amount is not paid, Landlord will seek court intervention.

Thank you.

Very truly yours,

*/s/ Kristy M. Castagna, Esquire*

KRISTY M. CASTAGNA

KMC/lap

cc:     Constantine Sotolidis
        James Cunilio, Esquire
        Charles Moss, Esquire

December 12, 2013

kcastagna@kanepugh.com

Bow Tie Cinemas, LLC
641 Danbury Road
Ridgefield, CT 06877
Attention: Charles B. Moss

     **RE:**    **BTC HOLDINGS V. SOTOLIDIS, ET AL**
             **2013-31096**

Dear Mr. Moss:

     Pursuant to the lease between Constantine, Isaak and Irene Sotolidis and BTC Holdings 432, LLC, BTC Venture 18, LLC is a guarantor under the lease.  You are being provided this notice as required under the provisions of the guaranty.  I have also enclosed a copy of my November 26, 2013 letter to BTC Holdings 432, LLC's counsel.  BTC Holdings 432, LLC remains in default under the lease.  Landlord is now exercising its rights under paragraph 10(1) of the lease and demanding acceleration of all rent due under the lease for the unexpired balance of the term.  The rent due is calculated as follows:

     Unpaid rent to date: $21,500.00
     Rent for unexpired term of lease: $560,000.00
     Additional Rent under lease:
- Unpaid 2013 Taxes: $11,566.07
- Taxes for 2014-2018: $60,508.44



- Unpaid 2013 Insurance premiums: $5,895.00
- Insurance premiums from 2014-2018: $23,580.00
- Unpaid Sewer fee: $3,405.77
- Estimated Sewer fees for 2014-2018: $12,000
- Unpaid Water bills: $1,558.71
- Estimated Water bills: $16,800.00

Total due: $716,813.99

You are hereby notified that you have ten (10) days to pay the total due of $716,813.99. If the full amount is not paid, Landlord will seek court intervention.

Thank you.

Very truly yours,

*/s/ Kristy M. Castagna, Esquire*

KRISTY M. CASTAGNA

KMC/lap

cc:   Mr. Constantine Sotolidis
      James Cunilio, Esquire
      A. Brooks Hock, Esquire

December 12, 2013

kcastagna@kanepugh.com

James Cunilio, Esquire
Cunilio & Cunilio
Attorney at Law
835 W. Lancaster Ave.
Bryn Mawr, PA 19010

      **RE:**    **BTC HOLDINGS V. SOTOLIDIS, ET AL**
                **2013-31096**

Dear Mr. Cunilio:

    As a follow-up to my letter of November 26, 2013, BTC Holdings 432, LLC remains in default under the lease. Landlord is now exercising its rights under paragraph 10(1) of the lease and demanding acceleration of all rent due under the lease for the unexpired balance of the term. The rent due is calculated as follows:

Unpaid rent to date: $21,500.00
Rent for unexpired term of lease: $560,000.00
Additional Rent under lease:
- Unpaid 2013 Taxes: $11,566.07
- Taxes for 2014-2018: $60,508.44
- Unpaid 2013 Insurance premiums: $5,895.00
- Insurance premiums from 2014-2018: $23,580.00
- Unpaid Sewer fee: $3,405.77
- Estimated Sewer fees for 2014-2018: $12,000
- Unpaid Water bills: $1,558.71
- Estimated Water bills: $16,800.00

Total due: $716,813.99

    You are hereby notified that you have ten (10) days to pay the total due of $716,813.99. If the full amount is not paid, Landlord will seek court intervention.

    Thank you.

                Very truly yours,

                */s/ Kristy M. Castagna, Esquire*

                KRISTY M. CASTAGNA

KMC/lap
cc:    Mr. Constantine Sotolidis
       Bow Tie Cinemas, LLC - Attn: Charles Moss
       A. Brooks Hock, Esquire



## VERIFICATION

I, Kristy Castagna, Esquire state under the penalties of 18 Pa. C.S. Section 4904 (relating to unsworn falsification to authorities) that I am the attorney for the Plaintiff in this within action; that as such, I am authorized to take this Verification; and that the facts set forth in the foregoing document are true and correct to the best of my knowledge, information and belief.

Date: January 30, 2014

Kristy M. Castagna